OAKFORD v. HACKLEY.

(Circuit Court, W. D. Pennsylvania. February 9, 1899.)

No. 1, September Term, 1895.

1. COAL LEASE—VALIDITY OF AGREEMENT TO EXECUTE.
   Evidence considered, and held insufficient to justify the refusal of an owner of land to perform an agreement to execute a coal lease thereon, on the ground of fraud and misrepresentation.

2. SPECIFIC PERFORMANCE—CONTRACTS ENFORCEABLE—AGREEMENT FOR MINING LEASE.
   A valid agreement, definite, and fair and reasonable in its terms, was made for the lease of a tract of coal land, to be mined by the lessee. The lease would necessarily extend through a number of years. The quantity to be mined each year was uncertain, and payment of a royalty was to be made to the owner according to a sliding scale, varying from year to year. Owing to a known fault in the vein, but the extent of

which was unknown, the total quantity of coal to be mined was very largely a matter of uncertainty. *Held*, that specific performance of the agreement would be decreed at suit of the lessee, on the ground of the inadequacy of his remedy at law for nonperformance, arising from the impossibility of determining the amount of his damages with any reasonable degree of certainty.

This was a suit in equity, by James W. Oakford against Mrs. Frances A. Hackley, to enforce the specific performance of an agreement to enter into a lease of certain coal lands owned by defendant.

Samuel B. Price, for complainant.

James E. Burr, H. W. Palmer, and Robert G. Ingersoll, for defendant.

BUFFINGTON, District Judge. This is a bill to enforce specific performance of an agreement for a lease of coal land in Lackawanna county. The bill was filed in the court of common pleas of that county,, and by the respondent, a citizen of the state of New York, removed to the circuit court. The proofs show that Frances A. Hackley, the respondent, by the will of her husband, who died in the summer of 1894, became the owner in fee of 150 acres of land situate in Lackawanna county, known as the "Thomas Bell Tract," and underlaid with anthracite coal. By letter of attorney, dated August 1, 1894, Mrs. Hackley constituted Judge William H. Jessup, of the city of Scranton, her attorney. On August 30th, Judge Jessup wrote Mrs. Hackley in reference to the Bell tract as follows:

"I have had applications for the leasing of the 150-acre tract of Thomas Bell. * * * It occurs to me that it would be a very good time to get the 150 acres leased now. There are not many tracts that are not under lease, and, of course, the sooner you get your tract under lease, the sooner you will be realizing from it. The borings that were made, of which I found among the papers the reports, would seem to show that quite an extensive fault exists in the tract, and under a portion of it there was no coal. As to whether any recent developments in the vicinity have changed this, it would be well for us to find out before making any definite arrangements; and, above all, it is worth more to you to have thoroughly reliable men to deal with, as it may run as long as you live, perhaps, than even to get a little better price from unreliable men, and being continually annoyed. That is my experience, and I know it was the experience of your husband, Col. Hackley; and I know, for that reason, he declined to negotiate with certain parties with reference to the property."

The reference to the report in this letter is to maps of borings which were found among the papers of Col. Hackley at the time of his death, by Judge Jessup, concerning which he testified as follows:

"The two maps of borings I told Mrs. Hackley I would bring home with me, because, in future leasing of the Thomas Bell tract, they would be important to show the parties who might desire to lease the land and the coal there was on it."

Additional letters were written by Judge Jessup to Mrs. Hackley, which were not put in evidence by either party; but on October 23d she wrote the judge as follows:

"Dear Sir: Your letter of the 16th instant, and also your telegram of yesterday, came duly to hand. * * * Note what you say in regard to the Thomas Bell tract, and will be glad to receive proposals for lease, which will have my immediate attention."

It should also be noted that Judge Jessup testified as follows:

"I had several talks with Mrs. Hackley, but I told her my advice would be, if she was anxious to be freed from annoyances and trouble of business, and as her property consisted of the Archbald property, which was then under lease, and this Thomas Bell tract in Pennsylvania,—that my advice would be to get both of them under long-term leases at the earliest date, so that she would know to a certainty what would be her regular income; and, as she had some matters in view in the way of charities, which she then talked about, she would thus know how much she could give to charity, or any object she pleased; and that was my advice to her. She seemed to consent to that."

The Archbald property was then under lease, but a renewal of the lease was arranged for by Judge Jessup, and executed by Mrs. Hackley. On the 27th of October, Oakford, the plaintiff, made an offer to lease the coal by the following letter:

"Scranton, Pa., Oct. 27th, 1894.

"To Hon. Wm. H. Jessup, Att'y for Mrs. Frances A. Hackley:

"I hereby offer to lease from you all the merchantable and minable coal in, under, and upon the Thomas Bell tract of land, in Lackawanna county, Pennsylvania, at the following rents, or royalties, viz.: For the first two (2) years, forty-two (42) cents for prepared sizes, one-half (½) of the price of prepared sizes for pea, and one-fourth of the price of prepared sizes for buckwheat, and one-eighth (⅛) of the price of prepared sizes for birdseye and culm, if sold and removed from the demised premises. After two years from date of leases, the royalty on prepared coal to increase at the rate of one (1) cent per annum up to a maximum of fifty (50) cents, and the smaller sizes proportionately. Lease to contain usual mining privileges and a reasonable minimum.

"[Signed]                                         J. W. Oakford.'

On November 8th, Judge Jessup took this offer to New York City, and submitted it to Mrs. Hackley, and, after consultation, the following acceptance was appended to the offer:

"I accept the above offer, and direct W. H. Jessup to draw up the proper lease for the coal mentioned.

"Nov. 8, 1897.                                   Frances A. Hackley."

On the same day Judge Jessup wrote Mr. Oakford as follows:

"Dear Sir: I write to inform you that your proposal to lease the coal on a part of the Thomas Bell tract owned by Mrs. Hackley is accepted by her, and I am directed to prepare a proper lease for the same. The acceptance is predicated upon the signing of such lease as I shall advise her to prepare.

"Very truly yours,

"W. H. Jessup, Attorney for Mrs. F. A. Hackley."

Subsequently Judge Jessup prepared a lease, which is printed as Exhibit C to plaintiff's bill, and on the 26th of November, 1894, the same was executed by Mr. Oakford. Without now going into detail, it is sufficient to state that respondent refused to execute the lease. Her position with reference thereto, for present purposes, is summarized by her answer to the request of Mr. Oakford for its execution, embodied in a letter, dated December 24, 1894, in which he says:

"(1) Have you any modifications of the present lease to suggest, which would make you willing to execute it? (2) If not, on what do you base your refusal to sign the lease with me?"

And her answer thereto, dated December 27th, as follows:

"In answer to your first question, I will say that, if I were going to sign the lease with you, there are many alterations which I should wish made; but, under all the circumstances, I am unwilling to sign the lease, however modified or amended. In answer to the second question, I will say that, on account of the painful misunderstanding and unpleasant feeling associated with the matter, I cannot conscientiously sign the lease according to the agreement, which I signed under a great misunderstanding of the facts."

An examination of the proofs in this case shows a specific offer to lease a body of ascertained coal upon definite terms, the acceptance of that offer in writing by the defendant, an authorization by her to her counsel to prepare a proper lease, notification to the plaintiff of the acceptance of the offer, preparation of the lease by the respondent's counsel, execution thereof by the plaintiff, and refusal on the part of the respondent to execute the lease. No specific objections are made to the form of the lease, but the refusal to execute is on the ground that the agreement was made under "a great misunderstanding of the facts." · The conditions and essentials prerequisite to jurisdiction and the entry of a decree for specific performance are all here found, unless the allegation of misunderstanding of facts is established. Such misunderstanding must, if it existed, have arisen in the case by reason of the acts of Oakford, the lessee, Mrs. Hackley, the lessor, or Judge Jessup, her attorney.

Misconduct on the part of Oakford, the purchaser, is urged in three particulars: (1) That he secured the lease by undue influence exercised, and misconduct on the part of Judge Jessup, by association with himself in the lease, or offering to associate, Judge Jessup's son, W. H. Jessup, and thereby procured a lease less favorable to Mrs. Hackley than other bidders would have entered into if they had been fairly treated; (2) that he concealed from Mrs. Hackley the fact that one J. N. Rice, a person objectionable to Mrs. Hackley, was associated with him in the lease; (3) that he represented to Mrs. Hackley that her relative, Joseph B. Dickson, was associated in the lease, and thereby procured her consent.

The first contention is not sustained by the proofs. While it is true that Mr. Oakford, who was a personal friend of young Mr. Jessup, did, during the preliminary stages of the negotiations, suggest to him that there might be an opportunity for him to take an interest in the lease, yet this offer or suggestion was, as it properly should have been, declined by Jessup.

As to the second contention, the fact that Mr. Oakford did not disclose Dr. Rice's connection with or interest in the proposed lease cannot fairly be attributed to any motive on his part to deceive Mrs. Hackley. There is no evidence whatever that he knew Dr. Rice was distasteful to Mrs. Hackley. Dr. Rice testifies that he had no knowledge of the fact that he was objectionable to Mrs. Hackley, or her deceased husband. His testimony shows that he and Judge Jessup had had some controversy or trouble, and that he feared, if he made the application for the lease to Judge Jessup, he would not receive as fair treatment as other bidders; and, knowing that Mr. Oakford was friendly with Judge Jessup, he procured him to negotiate the lease. We are therefore convinced that the facts proven in ref-

erence to this second contention show no impropriety or misconduct on the part of Mr. Oakford.

As to the third contention, of Dickson's alleged interest in the lease, the proofs fail to show that any allegations in regard to such interest induced any action by Mrs. Hackley. They show that no alleged or supposed interest of his in the lease was known to Mrs. Hackley on November 8th, when, by indorsement on Oakford's offer, she agreed to the giving of the lease. It therefore could have been, and was, of no effect in leading her to an agreement to give the lease. The first intimation to her of any such fact was conveyed in a letter of Judge Jessup to her, dated the 21st of November, which, after citing the preparation of the lease, and that Mr. Oakford would be in New York the next day to execute it, says:

"I understand he expects Mr. Dickson, of the firm of Dickson & Eddy, whom I believe you know very well, to be interested with him in this enterprise. Mr. Dickson will call upon you with Mr. Oakford, when the lease will be all ready to execute, and I think they are as near like the lease which was executed last week as the nature of the property will admit of."

It will therefore be seen that the fact of Mr. Dickson's connection with the lease could not have been an element in inducing Mrs. Hackley to sign the agreement of November 8th.

The proofs satisfy us, also, that no misrepresentation was made to Mrs. Hackley in that respect by either Mr. Oakford or Judge Jessup. The fact was that the Ontario & Western Railroad Company was interested in securing this lease, and in transporting the Bell coal to market. To that end it had agreed to furnish a substantial part of the funds necessary to its development. See letter of J. E. Childs, dated October 22, 1894, which is as follows:

"New York, Oct. 22, 1894.

"Dr. J. N. Rice, Scranton, Pa.—Dear Sir: Referring to our conversation at this office last Saturday, I have conferred with President Fowler, and he approves of the proposed arrangement. The company will loan two-thirds of the money necessary to start the operation,—this loan not to exceed fifty thousand, and subject to the usual conditions in relation to security and repayment.

"Yours very truly,          [Signed]     J. E. Childs, General Manager."

Mr. Dickson was the sales agent of that company's coal, and was interested in the way of commissions in the sale thereof. Under the circumstances, we see no impropriety whatever, under the proofs of this case, in Mr. Oakford, who was not personally acquainted with Mrs. Hackley, requesting Mr. Dickson to accompany him to see her when he went to have the lease executed in duplicate; nor was the fact that he should accompany one calculated to mislead Mrs. Hackley. Indeed, the fact that Oakford requested Dickson to go to Mrs. Hackley, and that Judge Jessup informed her before either came of the fact that Dickson was interested in the lease, shows that no impropriety was intended or undue influence to be exerted thereby on Mrs. Hackley. If the fact of Mr. Dickson's alleged interest was to be used as a lever to procure Mrs. Hackley's assent, and in point of fact he had no interest whatever in the lease, then assuredly Judge Jessup and Mr. Oakford, by placing Mr. Dickson face to face with Mrs. Hackley, were affording her means of obtaining the best possible

proof of misconduct on their part. We are therefore of opinion that, so far as Mr. Oakford is concerned, no act or omission has been shown on his part which would affect his right to a specific performance of this contract.

Turning, now, to the conduct of Judge Jessup, the allegation is made that in the making of the lease he was unfaithful to the interest of his client, and that he misrepresented the facts to her, and either wilfully or carelessly failed to secure for her a higher royalty for her coal than Mr. Oakford's offer. This charge is a serious one, affecting, as it does, the integrity of a member of the bar, of long standing, who has enjoyed the confidence of his fellow men. It is a charge that should not be lightly or unadvisedly made, and which should not be found by a court to be true, except upon clear and convincing proof.

After a careful consideration of these proofs, we have reached the conclusion that there is nothing which in any way impugns the integrity of Judge Jessup in the leasing of this land, and we are of opinion he acted throughout in perfect good faith. That a mistake may have occurred may be conceded, and that it may be possible that, if other bidders had known what Oakford had offered, they would have bid more; but, if such is the case, these facts were not occasioned by any lack of good faith or improper conduct on the part of Judge Jessup. In the first place, he made an effort to secure all possible lessees. He testifies that, among others, he interviewed Mr. Jermyn, Mr. Connell, Mr. Hand, and M. S. Kemmerer of Mauch Chunk. None of these men are called to contradict him. The last named examined the borings, and Judge Jessup says:

"I explained to him that Mrs. Hackley had accepted a bid of forty cents a ton for the re-leasing of the Archbald property, but that her ideas were very high in reference to the value of this property, and whoever would bid for it would have to bid very high."

He says he told the same thing to Mr. Oakford and to Mr. Sturges, who contemplated putting in a bid for the Dolph Coal Company. The alleged trouble or misconduct is said to have arisen in what Judge Jessup said to Mr. Sturges. The allegation is that Judge Jessup conveyed the idea to him that a 40-cent royalty was all Mrs. Hackley wanted, and that, if the Dolph Coal Company would bid that amount, they would get it. Mr. Sturges' version of the negotiations is as follows:

"When I came back, I went into Judge Jessup's office, and told him that I understood that he was attorney for Mrs. Hackley, and that the Dolph Coal Company wanted to lease the Thomas Bell tract whenever she was inclined to do it, and asked him whether she was ready to lease. He said he thought she was; that she wanted to get her properties paying royalties. * * * Then I asked him what royalties she would want for it. His answer was that she had just closed a contract with Messrs. Jones and Williams for renewal of their lease of their tract at 40 cents, the amount to be increased after two or three years, I think; and he thought she would want the same for the Bell tract. I told him that I thought it was too much, that this tract was nothing like as valuable as the Jones and Williams tract, that the acreage was very much smaller, that probably there was only one good vein, and that there was an extensive fault supposed to run across it. He said he knew that. They had had an examination made, and in their judgment there was something like one hundred acres only, and he gave me figures. He thought

there would be between six and seven hundred thousand tons, which agreed with what we had estimated. I told him that the Dolph Coal Company wanted it; that our headings ran almost alongside it for nearly half a mile, as I understood; that we could get into it within a week, or some short time (I think within a week), and commence paying royalties at once, but that the royalty for the land was high, and whether the Dolph Coal Company would pay it, or not, I didn't know, but they would soon have a meeting, and I would bring the matter before them, and see whether they would pay it. He said, 'Very well,' and I left him. I should say, in this conversation, he didn't state, in any way, shape, or manner, that they were taking propositions for mining this property, or that there was any competition, except he said there were two or three people inquiring about it. I knew there were dozens of people inquiring about every undeveloped coal tract in the valley. I left the office with the understanding, whether rightly or wrongfully, that it was simply a question whether the Dolph Coal Company was willing to pay forty cents a ton. I didn't understand anyone else was to bid, or that we were to offer any competitive bids. I didn't know there was any great haste about it, and didn't call any meeting, but waited for the regular meeting, which, I think, had been delayed that month. Some time afterwards, I think two or three weeks, I received this letter, which Judge Jessup has offered in evidence. I have the original here. You can compare it, if you want to:

"'Oct. 25, 1894.

"'E. B. Sturges, Esq.—Dear Sir: If the Dolph Coal Company desire to make a proposition for a lease of the coal on the Thomas Bell tract belonging to Mrs. C. B. Hackley, I would like to have them make the best proposition they are willing to make for the coal, and also a statement as to what arrangement they will make in reference to the culm, and where the same will be deposited, as in any lease to be executed for this she will undoubtedly require that the culm shall be separated from other land, or such an arrangement made in reference to the same as she shall have the benefit of it.

"'[Signed]                                                      Jessup & Hand.'

"'* * * There was nothing final about the thing at all. He gave me the impression that Mrs. Hackley would want forty cents a ton for that property, and, if the Dolph Coal Company would pay it, that they would get it. When I received this communication from Judge Jessup, I supposed that, having been slow about the thing, he simply was hurrying me up. I still didn't understand that there was any competition, or that others were bidding, or that I was to make any bid; but I at once got a meeting of the Dolph Coal Company. He said he wanted answer that week. I find a record on my diary, that we held a meeting on the afternoon of the next day, and that Mr. Dolph and I were appointed a committee. I presented this matter to the Dolph Coal Company, and stated to them what Judge Jessup had said,—that, if we wanted that land, we had to pay forty cents for it, and a sliding scale. They thought it was too much. After a good deal of discussion, we decided to pay it, and Mr. Dolph and myself were appointed a committee to make the proposal to Judge Jessup. As I remember, the only change that we tried to get was that the price should not commence to raise until five years, instead of two. We thought that, at the rate named, the raise in two years was too quick. Immediately after the meeting (the same day), in accordance with their action, Mr. Dolph and I sent this communication, dated October 26, 1894:

"'Hon. W. H. Jessup, Attorney for Mrs. C. B. Hackley—Dear Sir: The Dolph Coal Company have authorized Mr. Edward Dolph and myself to make the following offer for the coal under the Hackley tract, adjoining the Dolph workings: Forty cents per ton for sizes above pea, the price to raise one cent per year after five years. For pea and smaller sizes, the price to be proportioned, on the ratio of the selling price, to that of larger sizes. Lease to contain the usual clauses as to returns, examination, weights, etc., and provide a fair annual minimum. An account will be kept of all culm dumped, the same to be accounted for when sold, or to be subject to Mrs. Hackley's order in any reasonable way.

"'Yours, respectfully,                                   [Signed]   E. B. Sturges,
                                                                        "'For D. C. Co.' ".

## Witness, continuing:

"This communication was handed to Judge Jessup, or left in his office, and I heard nothing from it for at least two weeks,—more than two weeks. I had no doubt that the offer had been accepted, and that the lease had been made, or, at least, that if there was anything wrong about it, or unacceptable, I would hear from Mrs. Hackley or Judge Jessup at once: but I refrained still from communicating with Mrs. Hackley in any way. And I want to say right here,—I don't want to be misunderstood,—Judge Jessup didn't say that her price would be forty cents a ton, but that she had made a lease to Jones and Williams at forty cents, and he presumed she would want the same for this land. He didn't say that forty cents would be her price, but I understood that was her figure, and that, if we offered that, we would get it."

## Judge Jessup's version is this:

"Shortly after this Mr. Sturges called upon me, and said he was interested in the Dolph Coal Company; that he understood that Mrs. Hackley desired to lease this property; that their property adjoined the Thomas Bell tract on one side. I showed him the report of the borings upon the Thomas Bell tract, and told him the same thing which I had told Mr. Kemmerer and Mr. Oakford. He said that, as they adjoined this property, it was more to them than it was to anybody else, for they could mine the coal from this property without making any additional improvements; and he said that, if they could get a lease, they could be delivering coal within six weeks from the time they got their lease. He showed me, upon the map, which side their property adjoined this property,—I don't now remember which side it was,—and, after talking with him, I told him that Mrs. Hackley had accepted a proposition to lease to Jones and Williams for forty cents; that I considered the Archbald lease a more valuable property than I did this, because it was a larger property; but I told him Mrs. Hackley's views were very high in reference to this matter, and whoever got it would have to bid very high. I told him that there were two other gentlemen that I knew who proposed to bid upon the property, and, after talking with him some little time, he said, 'We can afford to give more for that property; I will make my best bid first,' and said, 'Whenever you are ready to receive bids, why, we will make a bid.' Shortly after I received this letter from Mrs. Hackley, which is dated October 24th and is marked 'Plaintiff's Exhibit A,' in which she said, 'Note what you say in regard to the Thomas Bell tract, and will be glad to receive proposals for lease, which will have my immediate attention.' Immediately after the receipt of that letter I notified Mr. Kemmerer, Mr. Oakford, and Mr. Sturges that Mrs. Hackley was ready to receive their proposals. I communicated with Mr. Kemmerer by telephone, and he asked who were expecting to bid for it. I told him Mr. Sturges and Oakford, so far as I knew; and he then said he had some business arrangements with the Dolph Coal Company, whom I knew Mr. Sturges represented, and he did not like to come into competition with them, for he wanted some favors from the Dolph Coal Company, and he was afraid he would not get them if he put in a bid against them, and was fortunate enough to get this property, and therefore he would withdraw, and not put in a bid at all. I also informed Mr. Oakford,—I think, personally. —and I wrote a letter to Mr. Sturges, and sent to his office, of which I have a carbon copy. * * * After receiving these offers, on the 8th day of November, I went to New York, taking with me the offer of Mr. Sturges and Mr. Oakford. I met Mrs. Hackley. I read to her the offer of Mr. Sturges, as I have read it here. I also read to her the offer of Mr. Oakford,—a better offer than that of Mr. Sturges, in that he was to give forty-two cents for the first two years, whereas Mr. Sturges was to give only forty cents a ton for the five years; that, as the Dolph Coal Company could immediately mine out the coal without any preparation, they would have the opportunity of mining the greater part of the coal, which was estimated at 650,000 tons, within five years, and could get it all for forty cents a ton, whereas the bid of Mr. Oakford was forty-two cents to start with, and, as he would be obliged to put on improvements to mine the coal, he would not be expected to get out any coal within a year, so that his price would increase at once

beyond the forty-two cents within a year after he had started to mine; and that I considered she would get a good deal more money out of it by leasing to Mr. Oakford than to Mr. Sturges, for the reason that it would be to their interest to mine all the coal they could at forty cents within the five years, instead of allowing it to remain in the ground and mining it out at the increased rates. She agreed with me that it was better. She asked me if Mr. Sturges would not give any more. I told her what Mr. Sturges had said to me in the office,—that they could afford to give more than anybody else, and he would make his best bid first, and that I had requested Mr. Sturges to make his best bid first, and I supposed that was his best bid. From what I knew of Mr. Sturges I did not believe he would give any more. Upon this she accepted Mr. Oakford's bid, and I wrote upon the paper the following:

"'I accept the above offer and direct W. H. Jessup to draw up a proper lease for the coal mentioned. Frances A. Hackley.

"'Nov. 8, 1894.'"

In the first place there is an utter absence of motive shown on Judge Jessup's part to part with his client's interest at an undervaluation. What possible motive could he have in so doing? The contention that his son was, or was to be, interested in Oakford's lease, is without foundation. If the respondent's contention is correct, Judge Jessup, without any proven motive or inducement, deliberately sacrificed the interests of a client whose business he would naturally value, and that, too, in a way in which he would be almost sure to be detected. An analysis of the testimony shows, to our mind, that Judge Jessup's version of his statement to Mr. Sturges is correct. In the first place, he says he made the same statement, namely, that, while Mrs. Hackley had re-leased the Archbald coal for 40 cents, she wanted more for this, to Kemmerer and others. Mr. Oakford testifies that Judge Jessup did so tell him. Mr. Kemmerer is not called to contradict Judge Jessup, and, in the absence of such contradiction, we are safe in assuming Judge Jessup stated to him as he testified. Now, if he had told these facts to both these gentlemen, and invited them both to put in bids, for what plausible or possible reason, or upon what theory, would he induce Mr. Sturges to put in a 40-cent bid. If he wanted to give the property to Oakford, why should he try to have Mr. Kemmerer put in a larger bid, and thus defeat his purpose? Judge Jessup testifies, and he is confirmed by the absence of any contradiction on the part of Mr. Kemmerer, that, after receiving word from Mrs. Hackley, as noted in her quoted letter, that she was willing to lease the Bell tract, he notified Kemmerer, and requested a bid, and, in answer to his inquiry as to who the bidders were, was told they would be Sturges and Oakford. It then developed that Kemmerer did not want to antagonize the Dolph Coal Company, and so declined to bid. It will thus be seen that the effort of Judge Jessup to get a third bid for the property was defeated, not by any lack of desire on his part, but by reason of the Dolph Coal Company. The letter of Judge Jessup to Mr. Sturges of October 25th, which is given in full above, is consistent with Judge Jessup's version of the previous conversation. It will be noted that he asks them to make "the best proposition they are willing to make for the coal." This is quite consistent with Judge Jessup's testimony that:

"I told him that there were two other gentlemen that I knew who proposed to bid upon the property, and, after talking with him some little time, he said,

'We can afford to give more for that property; I will make my best bid first,' and said, 'Whenever you are ready to receive bids, why, we will make a bid.' "

The proof also shows that, however much they may have subsequently changed their minds, the bid put in was the most the Dolph Coal Company was at that time willing to pay. Mr. Sturges says that in his first talk with Judge Jessup he told him that:

"The royalty for the land was high, and whether the Dolph Coal Company would pay it, or not, I didn't know, but they would soon have a meeting, and I would bring it before them, and see whether they would pay it."

At the meeting where the matter was considered, he says:

"I presented this matter to the Dolph Coal Company, and stated to them what Judge Jessup had said,—that, if we wanted that land, we had to pay forty cents for it, and a sliding scale. They thought it was too much. After a good deal of discussion, we decided to pay it, and Mr. Dolph and myself were appointed a committee to make the proposal to Judge Jessup."

It would therefore seem that, as things then stood, the bid then made was the best the Dolph Coal Company was willing to do, and that they were not even willing to pay what Mr. Sturges says he understood would be necessary to secure the property, to wit, pay 40 cents, with a sliding scale after two years. They postponed the rise till five years. The substantial difference between their bid and Mr. Oakford's may be thus illustrated: Assuming there were 600,000 tons in the tract, and it would be taken out in equal proportions through the 10 years, the average royalty paid by Oakford would be 46 cents, and by the Dolph Coal Company $41\frac{1}{2}$ cents, which would make Oakford's lease net $27,000 in royalties more than Dolph's. Tested by the views of the members of the Dolph Coal Company,—and Mr Sturges has testified to their views, freely expressed at the meeting, that a royalty of 40 cents, with a sliding scale after two years, was too high, and that they were only willing to pay a sliding scale rising after five years,—bearing in mind that, with its improvements ready for beginning operations at once, the price remained stationary for five years, and therefore, if the Dolph Coal Company got the lease, the bulk of the coal would be mined at 40 cents, it would seem that Judge Jessup had obtained an exceptionally fine price for his client's coal.

A careful scrutiny of the proofs satisfies us that Mr. Sturges not unnaturally fell into the mistake of supposing that he would get the coal cheaper than any one else. The Dolph headings ran alongside it for nearly half a mile, an entrance could be made within a few days, and their breaker, trackage, and other improvements used to mine this coal. It would therefore seem quite natural that in time the Dolph Company should get this coal,—a feeling which was evidenced by Mr. Sturges' remark to Dr. Rice, "I asked him if he wasn't a little gally in using my ammunition to shoot my ducks." That some one else would slip in and bid a considerable advance over them seemed never to have occurred to their minds. When informed she had signed the option, Mr. Sturges says, "Of course, I was utterly dumbfounded; I never had thought of such a thing." But that there was any misrepresentation on Judge Jessup's part, or that he told Mr. Sturges that 40 cents was Mrs. Hackley's price, Mr. Sturges himself does not say. He testifies:

"And I want to say right here,—I don't want to be misunderstood,—Judge Jessup did not say her price would be forty cents per ton, but that she had made a lease to Jones and Williams at forty cents, and he presumed she would want the same for this land. He did not say that forty cents would be her price, but I understood that was her figure, and that, if we offered that, we would get it."

Feeling sure, as we have noted, from their abutting against the property, that the coal would naturally drop to them, it is not surprising that Mr. Sturges and his company should receive the impression they did; but the fact remains that such an impression was a mistake on their part, and was not caused by Judge Jessup.

An agreement to lease, fair and reasonable in terms, certain in its subject, and procured without fraud or mistake, being shown, will equity afford relief in the way of specific performance? We think, in this particular case, it should, because otherwise the complainant would be without an adequate remedy at law. The general doctrine is that in contracts for the sale and purchase of lands, as a class, damages are inadequate. Pom. Spec. Perf. Cont. p. 38. In discussing the question as to where equity will give relief, it is laid down by the same author (page 9) that where the legal remedy is impracticable, where from special, practical features of a contract, inherent in its subject-matter or its terms, it is impossible to arrive at a legal measure of damages with any sufficient degree of certainty, so that no real compensation can be obtained in an action at law, then equity will specifically enforce the contract. By this means alone can the injured party have the substantial effect of his agreement. "To this head," the author says (page 46), "must be referred a variety of different agreements,—among others, contracts in which acts are to be done or articles delivered by one party, and payments are to be made by the other, in installments, at stated times, through a number of years, and where, to compel the plaintiff to accept a present sum, by way of damages, for a nonperformance, would be forcing him to sell his expected profits for a price wholly conjectural." In summing up his conclusions from an examination of the cases, the author states, and his reasoning to our mind is sound, as follows:

"The foregoing instances are sufficient to illustrate and establish the doctrine that equity may interpose, and specifically enforce a large variety of agreements, where the measure of legal damages is purely conjectural, and the legal remedy of compensation is, therefore, wholly impracticable. These cases have also been, and generally are, cited to show that equity has jurisdiction where damages are inadequate; but the inadequacy here consists in the impossibility of arriving at any definite amount of damages, by means of the certain and fixed rules which govern the common-law methods of administering justice."

Applying this principle to the case in hand, we think it pre-eminently one where the remedy at law would be comparatively inadequate, when contrasted with the adequacy of the equitable remedy of specific performance. The lease must necessarily extend through a number of years, the amount of coal mined each year is uncertain, and the royalty payable depends, owing to the sliding scale, running from 42 to 50 cents, on the year in which it is mined. In addition to this, the faults in the coal, and the extent of such faults, all of which are problematical, and now necessarily uncertain, render the

value of the lease uncertain. The foregoing facts show the wide possible variation in the values set upon this coal, and the conjectural value of the lease as a working interest. In the matter of royalties alone, to say nothing of the possible financial results of working the coal, we have seen a net difference of $27,000 in estimated value; and these show the wide range of possibilities and probabilities to which a jury could alone resort in estimating the value of the undeveloped lease. It is, therefore, clear to us that, in the uncertainty surrounding the subject-matter, and the necessarily conjectural character of the evidence that alone could be submitted, the fixation of any amount by a jury would be conjectural in character. By decreeing specific performance, we have the assurance that the agreement which the parties made would be carried out; while, in remitting the parties to an action at law for damages, from the problematical character of the testimony to be submitted to the jury, we could have no assurance that substantial justice between the parties was reached. "When a contract concerning real estate is valid, unobjectionable in its nature and in the circumstances connected with it, and capable of being enforced, and it is just and proper that it should be fulfilled, it is as much a matter of course for a court of equity to decree a specific performance as for a court of law to give damages for the breach of it." Wat. Spec. Perf. Cont. p. 7, § 6.

We are therefore of opinion, after careful consideration, that the case is one for a decree of specific performance.