NORTHWESTERN LUMBER CO. v. GRAYS HARBOR & P. S. RY. CO. et al.

(Circuit Court of Appeals, Ninth Circuit.    February 15, 1915.)

No. 2423.

1. SPECIFIC PERFORMANCE ☞37 — CONTRACTS ENFORCEABLE — CONTRACT FOR SALE OF REAL ESTATE.

Where a preliminary agreement for a sale of real estate, in the form of a letter and acceptance, contained a provision that "a formal agreement shall be entered into, pending actual transfers," such formal agreement, if it is to contain anything more than mere detail, is essential to a completed contract which may be specifically enforced in equity.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 108–112;  Dec. Dig. ☞37.]

2. SPECIFIC PERFORMANCE ☞37—CONTRACT ENFORCEABLE—SALE OF REAL ESTATE.

An agreement was made by letter and acceptance for the sale by complainant to defendant railroad company of real estate for right of way and terminal purposes in a city. It provided that, pending actual transfers, a formal contract should be entered into. Such a contract was prepared by representatives of both parties and signed by defendant; but complainant, before signing, changed it by adding two provisions: The first, that there should be a cash payment on its execution, which was contrary to the terms of the preliminary agreement; and the second, that a bridge which it was necessary for defendant to build should be for the common use of defendant and the city, provided the city would contribute its share of cost and maintenance, which was entirely outside of such agreement. Defendant objected to the latter provision, because it was negotiating with the city in relation to the bridge, and wanted it stricken out, or that the matter should stand open until it came to an agreement with the city. Complainant demanded and received back the contract it had signed, and nothing further was done for more than a year, when defendant, having reached an agreement with the city, notified complainant that it was ready to close the contract. Complainant then demanded $10,000 additional for the property as interest, which defendant refused to pay. Complainant made no tender of performance. A year later, after defendant had made other arrangements for entering the city, complainant tendered deeds and demanded payment of the price originally agreed upon, which was refused. *Held*, that the minds of the parties had never met on a contract which could be specifically enforced in equity, but, on the contrary, it had been definitely abandoned when complainant demanded and defendant refused payment of interest, which was not provided for in the preliminary agreement.

[Ed. Note.—For other cases, see Specific Performance, Cent. Dig. §§ 108–112;  Dec. Dig. ☞37.]

Appeal from the District Court of the United States for the Southern Division of the Western District of Washington; Edward E. Cushman, Judge.

Suit in equity by the Northwestern Lumber Company against the Grays Harbor & Puget Sound Railway Company, the Oregon & Washington Railroad Company, the Oregon-Washington Railroad & Navigation Company, and the Chicago, Milwaukee & Puget Sound Railroad Company. Decree for defendants, and complainant appeals. Affirmed.

For opinion below, see 208 Fed. 624.

The Northwestern Lumber Company, plaintiff in the court below, is a corporation organized under the laws of the state of California. The defendants

Grays Harbor & Puget Sound Railway Company and the Chicago, Milwaukee & Puget Sound Railway Company are corporations of the state of Washington. The defendant Oregon & Washington Railroad Company and the defendant Oregon-Washington Railroad & Navigation Company are corporations of the state of Oregon. The term "Lumber Company" will be used in this opinion to refer to the Northwestern Lumber Company. The term "Railway Company" will be used to refer to the Grays Harbor & Puget Sound Railway Company.

The city of Hoquiam is situated on Grays Harbor, in Chehalis county, Wash., at the mouth of the Hoquiam river. The river flows through the city and divides it into two sections. The larger section, in which are located the lands involved in this suit, is the business section, and lies on the west bank of the river, and is known as West Hoquiam. The residence district of the city lies on the east side of the river, and is known as East Hoquiam.

In the year 1908 the Railway Company began the construction of a line of railway extending from the city of Centralia, in Lewis county, Wash., into the city of Hoquiam. The proposed route of the railway was from Centralia to Aberdeen, thence to and through East Hoquiam to the Hoquiam river, and thence across the Hoquiam river by bridge into West Hoquiam, where the railway company proposed to erect a depot and other station buildings.

The Lumber Company was at that time the owner of a large body of land extending along the Hoquiam river in West Hoquiam; and in September, 1908, the Railway Company entered into negotiations with the Lumber Company with a view of acquiring a right of way for its road through the lands of the Lumber Company. As a result of these negotiations, the Lumber Company, on September 25, 1908, submitted to the Railway Company, in writing, four proposed rights of way through its property, designated, respectively, the "Railroad Avenue Line," the "River Avenue Line," the "Simpson Avenue Line," and the "Emerson Proposition."

The proposal respecting the "Simpson Avenue Line" was as follows: " 'Simpson Avenue Line,' with depot grounds in block 50. Across Northwestern Lumber Company's log pocket on the extension of Simpson avenue, which is across lot 1 of tract 15, plate 9, Hoquiam Tide and Shore Lands; thence across or along Levee street, adjacent to blocks 70, 62, 61, 88 feet in block 51, and 250 feet 11 inches, in block 50, together with the return right of way through blocks 62, 70, and 69, joining Northern Pacific right of way through those blocks, and through lot 3, tract 15, plate 9, to Railroad avenue along Twelfth street vacated and adjoining Northern Pacific track, to K street. This right of way to be adequate for double trackage, except on its return or switch track through blocks 70, 69, and Twelfth street. Also to include for depot grounds the east 182 feet of block 50—all for the sum of one hundred two thousand dollars ($102,000.00)."

The proposal respecting the "Emerson Proposition" was as follows: " 'Emerson's Proposition.' The same as Simpson Avenue Line, omitting depot grounds in block 50 and adding the east half of blocks 62 and 61 and 88 feet on Levee street by 100 feet in block 51; you to join with the Northwestern Lumber Company dedicating 50-foot street along the center line of blocks 61 and 62, for the sum of one hundred thirty-four thousand dollars ($134,000.00)."

After due consideration of the several propositions submitted by the Lumber Company, the Railway Company decided to acquire for its right of way the property of the Lumber Company embraced in the "Emerson Proposition." On June 9, 1909, Mr. H. F. Baldwin and Mr. J. B. Bridges, chief engineer and attorney, respectively, for the Railway Company, met with Mr. C. H. Jones and Mr. George H. Emerson, president and vice president, respectively, of the Lumber Company, at the offices of the Lumber Company, and thereupon the following agreement in the form of a letter and acceptance was executed by each of the parties:

"June 9, 1909.

"Northwestern Lumber Company, Hoquiam, Wash.—Gentlemen: We beg to advise you that we accept what is called the 'Emerson Proposition' contained in your letter to Mr. H. F. Baldwin, dated September 25, 1908, being your proposition for one hundred and thirty-four thousand ($134,000) dollars. We

will present you a map showing in detail such proposition, and a formal agreement shall be entered into, pending actual transfers. However, we will expect and you shall give us your co-operation in procuring other properties in Hoquiam, and also franchises in Hoquiam. You shall without delay furnish our attorneys with abstracts of title, and our attorneys shall have twenty (20) days after delivery of abstracts within which to examine same, and upon our attorneys passing title, and delivery by you to us of proper deeds of warranty to such property, we will pay you the aforesaid sum. All buildings to be removed by you within six months from date of deed.

> "The Grays Harbor & Puget Sound Ry. Co.,
> "By H. F. Baldwin.

"We accept the foregoing proposition.

> "The Northwestern Lumber Company,
> "By C. H. Jones, Prest."

In the latter part of June, 1909, Mr. J. R. Holman, who had succeeded Mr. Baldwin as chief engineer of the Railway Company, and Mr. Bridges, attorney for the Railway Company, met with Mr. Emerson, on behalf of the Lumber Company, for the purpose of drafting the formal agreement called for by the foregoing letter and acceptance. The agreement was dictated by Mr. Bridges. It provided for a sale by the Lumber Company to the Railway Company of the various parcels of land embraced in the "Emerson Proposition" for the consideration of $134,000. The agreement also contained the following paragraphs:

"(5) The deeds hereby called for and the payments herein provided to be made shall be made on or before the 1st day of August, 1909, provided the title to the lands herein described be found by the second party to be sufficient and be passed by its attorneys.

"(6) The said first party [the Lumber Company] shall be entitled to the possession of the lands herein agreed to be conveyed, for the period of six months immediately following the date of the execution and delivery of the deeds and instruments herein provided for: such possession to be free of rent, and the said party is given the right to remove any and all buildings or improvements on any of the said lands, provided such removal be done on or before six months of the date of said deed and other instruments, provided said party of the second part [the Railway Company] may enter upon any of the premises herein proposed to be conveyed, for the purpose of beginning and carrying on the construction of its railroad and bridges, in so far as it can be done without injury to the said party of the first part, and in the enjoyment of right granted them in the first part of this paragraph.

"(7) It is agreed by the said first party and their officers that they will co-operate with the said second party in procuring such franchises of the city of Hoquiam as it may desire, and in securing such additional rights of way in the city of Hoquiam as the second party may desire."

A copy of the agreement was sent to the Lumber Company for execution. While the agreement was in the hands of the Lumber Company it was changed by that company in two substantial respects:

(1) By the terms of the draft the purchase price of the property was to be paid on or before the 1st day of August, 1909. As changed by the Lumber Company it was provided that $20,000 of the purchase price should be paid upon the execution of the agreement.

(2) The following paragraph, numbered 8, was added: "It is stipulated by the first party that the construction of the approach to the proposed bridge on the extension of Simpson avenue shall be so arranged as to interfere with the handling of logs in their millpond the least possible, and with that object in view that an ample span shall be placed west of the west pier of the drawbridge, and that the bridge abutment be placed as nearly as possible, consistent with the economical spacing of the spans of said bridge, and in accordance with the requirements of the United States government, about 30 feet into the river from the line of the piles of the first party's pond as such piles are now driven. It is also further stipulated by the first party that such bridge may be a joint user bridge with the city of Hoquiam, provided the

city of Hoquiam contributes its share of cost of construction and maintenance."

The agreement, modified and changed in the respects mentioned, was then executed by the Lumber Company, and on June 30, 1909, was forwarded by that company to Mr. Bridges, attorney for the Railway Company, together with a letter wherein the attention of the latter was called to the various changes made in the agreement before execution by the Lumber Company. All of the changes in and modifications of the agreement made by the Lumber Company were acquiesced in and agreed to by the Railway Company, with the exception of the last clause of the added paragraph 8, as follows: "It is also further stipulated by the first party that such bridge may be a joint user bridge with the city of Hoquiam, provided the city of Hoquiam contributes its share of cost of construction and maintenance."

It appeared from the testimony at the trial of the case that the Railway Company had applied to the city of Hoquiam for a franchise or permit to build a bridge for its road across the Hoquiam river at Simpson avenue. During the pendency of the application, the city had appointed a committee to confer with the Railway Company respecting the erection of a bridge which could be used jointly by the city and the Railway Company. These negotiations were pending at the time of the execution of the letter agreement of June 9, 1909, between the Railway Company and the Lumber Company. The reason assigned by the president of the Lumber Company for inserting the clause respecting the joint user bridge was that his company wanted to go on record as being in favor of the plan which the city of Hoquiam was insisting upon; that the Lumber Company did not want the city to think that it was opposed to the erection of a bridge which should be used by the city and the Railway Company jointly.

On July 23, 1909, the attorney for the Railway Company notified the Lumber Company of the refusal of his company to execute the agreement unless the clause respecting a joint user bridge over the Hoquiam river was eliminated. The reason for desiring the clause removed from the agreement was set forth in the following letter written to the Lumber Company: "Mr. Farrell, the general manager of the railroad company, desires that this clause be stricken from the contract before it is signed by the railroad company. His position is that we are negotiating with the city of Hoquiam concerning the bridge rights, and he thinks that the matter of a common user bridge should be one to be left to adjustment altogether by the railroad company and the city. I so expressed myself to your Mr. Jones, but at the same time he seemed to be of the opinion that the clause should remain in the contract. We shall continue our negotiations with the city concerning this matter, and find out what disposition it has concerning the bridge, and will later advise you about it; meanwhile we would like for you to consent to the clause quoted to be stricken out, and, if you will not so consent, then we ask that the matter may stand as it is until we can come to some definite arrangements with the city concerning the matter."

Subsequently several conferences were held between the officials of the two companies with respect to the objectionable clause, but they were unable to reach any agreement concerning it. On September 15, 1909, the Lumber Company forwarded to the attorney for the Railway Company the following letter: "Please deliver to the bearer the deed and any other papers that may be in your hands belonging to the Northwestern Lumber Company and connected with the right of way transaction, pending between the Northwestern Lumber Company and the G. H. & P. S. Ry."

The papers were sent to the Lumber Company, together with the following letter: "Per your request of this date, I herewith hand you a proposed agreement between yourself as the party of the first part and Grays Harbor & Puget Sound Railway Company as the party of the second part, the same being with reference to the purchase of certain properties from you; such agreement being dated July 7, 1909, and having been executed by you, but not by the Railway Company. I consider that, since this agreement has not been executed by the Railway Company yet, you are entitled to have it returned to you; but by so returning to you it is not the intention of the Railway Company to waive any rights which it had with reference to the agree-

ment to purchase this property, and I anticipate that it is not your intention that the handing of these papers to you shall have that effect."

Thereafter negotiations were suspended, and the matter of the execution of the agreement was left in abeyance, pending the solution of the controversy between the Railway Company and the city of Hoquiam respecting the bridge to be erected by the Railway Company over the Hoquiam River. On September 9, 1910, the Railway Company reached an agreement with the "citizens' committee" representing the city of Hoquiam, concerning the bridge, by which it was understood that the bridge which the Railway Company proposed to build should not be a common or joint user bridge, but that the Railway Company would build a lift bridge on one side of Simpson avenue, and that the city and the Railway Company would join in building the piers of sufficient length to enable the city to build a lift bridge on the other side; the city to have the right to proceed with its construction of the bridge whenever it chose, but to join with the Railway Company in the construction of the piers.

The effect of the agreement between the Railway Company and the city of Hoquiam being to render the clause respecting a joint user bridge which the Lumber Company had inserted in, and had insisted should remain in, the agreement with the Railway Company, immaterial and of no effect, the Lumber Company was notified thereof, and a conference was held on September 9, 1910, at the office of the Railway Company in Seattle, between Mr. Jones, the president of the Lumber Company, and Mr. Bridges, attorney, and Mr. Holman, chief engineer, of the Railway Company, for the purpose of executing the agreement theretofore drafted by the parties. There is a sharp conflict in the testimony with respect to just what occurred at this meeting. Mr. Bridges and Mr. Holman testified that Mr. Jones demanded $144,000 for the properties enumerated in the "Emerson Proposition," being $10,000 more than the price originally agreed upon and named in the letter of June 9, 1909, and in the formal draft of the agreement. On the other hand, Mr. Jones testified that he demanded no additional sum for the properties, but did ask that the Railway Company pay to the Lumber Company interest on the $134,000 for the period of time that had elapsed since the Lumber Company had executed the acceptance of the letter of June 9, 1909. That period was one year and three months, and at the legal rate of 6 per cent. prescribed by the statute of Washington the interest would have amounted to $10,050. Whatever may have been the demand of the Lumber Company, the Railway Company refused to consent to the payment to it of any amount in excess of the agreed price of $134,000, either as additional consideration or as interest. No further negotiations or conferences were had between the parties.

In May, 1911, the Railway Company entered into an agreement with the Northern Pacific Railway Company for the use of the latter's tracks and right of way into the city of Hoquiam, together with its depot facilities and also its bridge across the Hoquiam river. After this agreement had been made public, the Lumber Company prepared deeds for the various parcels of land covered by the letter of June 9, 1909, and made tender thereof to the Railway Company, at the same time demanding payment of the purchase price named in the letter, to wit, $134,000. No demand was made for interest. The tender and demand were rejected by the Railway Company. Thereupon the present suit was instituted.

On June 27, 1910, the Railway Company sold all of its properties, including the contract the specific performance of which is sought by this suit, to the Oregon & Washington Railroad Company, and the latter company, on December 23, 1910, sold all of its properties, including the contract, to the Oregon-Washington Railroad & Navigation Company. The Chicago, Milwaukee & Puget Sound Railway Company, prior to these transfers, had acquired some interest in the property of the Railway Company, and the defendants Oregon & Washington Railroad Company and the Oregon-Washington Railroad & Navigation Company took over the properties of the Railway Company charged with such interest. Each of the Railroad Companies has therefore been joined as a defendant in the suit.

The court below, after hearing, entered a final decree adjudging that the bill of complaint be dismissed.

B. S. Grosscup and W. C. Morrow, both of Tacoma, Wash., for appellant.

W. H. Bogle, Carroll B. Graves, F. T. Merritt and Lawrence Bogle, all of Seattle, Wash., for appellees.

Before GILBERT, ROSS, and MORROW, Circuit Judges.

MORROW, Circuit Judge (after stating the facts as above). [1] This is an action to enforce the specific performance of a contract. The contract relates to the sale and conveyance of real estate, which must be in writing under the statutes of Washington (Ballinger's Codes and Statutes of Washington, §§ 4517, 4518), and under the statute of frauds. Swash v. Sharpstein, 14 Wash. 426, 44 Pac. 862, 32 L. R. A. 796. The exception that performance or part performance will take the contract out of the statute is not involved in this case. The only writing signed by the parties making the agreement is a letter of the Railway Company, dated June 9, 1909, and its acceptance by the Lumber Company. Was this writing a completed contract, or in part a treaty looking to further negotiations and an agreement with respect to details not mentioned in the letter? The letter contained this provision, among others:

"A formal agreement shall be entered into, pending actual transfers."

This provision was as much a term of the letter and its acceptance as the purchase price or any other term therein mentioned. What was the purpose of this provision? No transfer was to be made until this formal agreement had been entered into by the parties to the transaction. The provision is plainly open to the construction that the contract for the conveyance of the real estate was not to come into existence until this formal agreement had been drawn up and executed by the parties; and there are cases of the highest authority holding that under such a provision the execution of a formal contract is a necessary proceeding in the making of the completed contract.

In Chinnock v. Marchioness of Ely, 4 De Gex, J. & S. 638, 46 Eng. Rep. 1066, the action was for the specific performance of an agreement contained in letters offering to sell real estate, and the acceptance of the offer by the intending purchaser. One letter, written by the solicitors of the vendor, contained this statement:

"The draft contract is being prepared and will be forwarded to you for approval in a few days."

The draft contract was never signed. Lord Chancellor Westbury, in construing these letters, said:

"If to a proposal or offer an assent be given subject to a provision as to a contract, then the stipulation as to the contract is a term of the assent, and there is no agreement independent of that stipulation."

In Winn v. Bull, 7 Ch. Div. 29, there was a written agreement for the leasing of a dwelling house for the term of seven years containing this provision:

"This agreement is made subject to the preparation and approval of a formal contract."

The solicitor for Winn, the owner of the house, subsequently sent to the solicitor for Bull, the prospective lessee, a draft of the proposed lease containing a covenant on the part of the latter to keep the premises in repair. The original agreement provided that the first year's rent was to be allowed to Bull, the lessee, to be paid out by him in substantial repairs to the property. Bull objected to the covenant in the draft of the formal agreement requiring him to keep the premises in repair. After correspondence between the parties, resulting in Winn agreeing to a lease substantially in its original form, Bull refused to take the lease at all. Winn thereupon brought an action for the specific performance of the original agreement. The defendant Bull relied upon the statute of frauds, alleging that the agreement was conditional only, and that no final agreement for the lease was ever reduced to writing or signed by him or his agent, within the meaning of the statute. Sir George Jessel, Master of the Rolls, was of opinion that there was no contract. He said:

"The distinction between an agreement which is final in its terms, and therefore binding, and an agreement which is dependent upon a stipulation for a formal contract, is pointed out in the authorities."

He then referred to Chinnock v. Marchioness of Ely, supra, and said:

"It comes, therefore, to this: That where you have a proposal or agreement made in writing expressed to be subject to a formal contract being prepared, it means what it says; it is subject to and is dependent upon a formal contract being prepared."

In Page v. Norfolk, 70 L. T. R. 781, the plaintiffs had by letter offered the defendants a specific sum for their business as brewers, including freehold and leasehold premises. The letter contained the following provision:

"This offer is made subject to our approving a detailed contract to be entered into."

The letter mentioned the date for completion, and referred to the payment of the purchase money in cash and preference and debenture stock of a brewery company to be formed. The defendants accepted the terms contained in the letter by signing it. Subsequently they refused to complete it, and the plaintiff brought an action for the specific performance of the original agreement, having waived the provision as to the detailed contract. The appellate court held that the agreement in the letter and its acceptance was not a binding contract between the parties, inasmuch as it was made subject to the plaintiff "approving a detailed contract to be entered into."

In Hackley v. Oakford, 98 Fed. 781, 39 C. C. A. 284, the plaintiff, Oakford, submitted to the attorney for the defendant, Hackley, a written proposal to lease from the defendant certain coal lands for mining purposes. The proposal stated the royalties to be paid, but contained the condition:

"Lease to contain usual mining privileges, and a reasonable minimum."

The proposal was submitted to the defendant by her attorney, who wrote the plaintiff, stating that:

"The acceptance is predicated upon the signing of such a lease as I [the attorney] shall advise and prepare."

The attorney thereupon prepared a lease and submitted copies to both the plaintiff and the defendant. The defendant declined to sign the lease, but, so far as appears, without making any specific objection to its form. The plaintiff signed it, and insisted upon its performance, and brought suit accordingly. The decree of the Circuit Court was in favor of the plaintiff (Oakford v. Hackley, 92 Fed. 38), but the Circuit Court of Appeals reversed the decree and directed the dismissal of the bill, on the ground that there could be no decree for specific performance in the absence of a specific contract, and that until all the essential points had been mutually and finally assented to there was no such contract. A petition for a writ of certiorari was presented to the Supreme Court and denied. Oakford v. Hackley, 177 U. S. 694, 20 Sup. Ct. 1028, 44 L. Ed. 945.

The foregoing cases state no new principle of law, but they are instructive as illustrating how the courts, in dealing with negotiations for a contract, adhere strictly to the requirement that to make a contract the minds of the parties to it must come to an agreement with respect to its essential terms; and when one of such terms in a preliminary agreement provides for a formal agreement to be entered into between the parties, the formal agreement, if it is to contain anything more than mere detail, is necessary to the completion of the contract; and when the agreement is within the statute of frauds the terms of such a contract must be in writing.

[2] This brings us to the consideration of the evidence relating to the negotiations carried on by the parties respecting the formal agreement provided for in the letter of June 9, 1909. The first draft of the formal agreement was prepared by representatives of both the Railway Company and the Lumber Company. The president of the latter company refused to accept this form of the agreement, and he thereupon prepared or had prepared for him a second draft, which he signed, containing a number of changes and additions. The first draft of the agreement provided for the payment of the purchase price upon the execution and delivery of the deeds of conveyance, in accordance with the terms of the letter of June 9, 1909. The second draft provided for the payment of $20,000 cash upon the execution of the agreement, and the remainder of the purchase price upon the execution of the deed. This was a distinct departure from the terms of the letter and its acceptance; but, as it was consented to by the Railway Company, the change became immaterial. But the fact that such change was made by the Lumber Company affords strong evidence that that company did not at that time consider itself bound by the terms of the letter and its acceptance as a completed contract.

There was also inserted by the Lumber Company a clause stating that the bridge which the Railway Company proposed to build over the Hoquiam river might be a bridge for the joint and common use of the Railway Company and the city of Hoquiam, provided the city of Hoquiam contributed its share of the cost of construction and maintenance thereof. This was objected to by the Railway Company. It

was evidently not a matter of mere detail, which it is conceded the parties might have inserted in the formal agreement without incurring the objection that it was a new term not previously assented to. It was in no wise connected with the general scheme of the agreement between the parties which was outlined in the letter of June 9, 1909, and was a distinct departure from any of the writings which had been exchanged between the parties. It was manifestly a matter of primary importance to the Railway Company, in making the proposed contract, to know whether the bridge which it proposed to build across the Hoquiam river should be of a type of its own choosing, and built and used by itself alone, or whether it should be required to permit the city of Hoquiam to have a voice in the construction of the bridge, and should be further required to permit the city of Hoquiam to use the bridge jointly with it. This was a subject which, so far as the correspondence between the parties, or the letter and its acceptance, show, had not been considered by either of the parties, and upon which their minds had not met during the negotiations leading up to the signing of the letter of June 9, 1909, and its acceptance.

But the Lumber Company contends that the clause respecting a joint user bridge, inserted by them in the draft of the agreement, was no departure from the letter of June 9, 1909; that it was inserted by it in furtherance of the provision in the letter providing that the Lumber Company would give to the Railway Company its co-operation in procuring other properties and other franchises in Hoquiam; that the paragraph numbered 7 in the draft of the agreement, providing that the Lumber Company would "co-operate with the said second party in procuring such franchises of the city of Hoquiam as it may desire, and in securing such additional rights of way in the city of Hoquiam as the second party may desire," was broader than the corresponding clause in the letter, and that the insertion of the bridge clause at the end of paragraph 8 was essential to limit the terms of paragraph 7.

There are several answers to this contention. The most obvious one is that there is no relationship between the two clauses. The added clause would not have restricted the provisions of paragraph 7, nor would it have relieved the Lumber Company of the obligation imposed by that paragraph. Again, the Lumber Company might have eliminated paragraph 7 as it was worded in the draft (if in its opinion it was broader than the corresponding clause of the letter), and might have substituted therefor the language respecting co-operation in securing franchises contained in the letter. We do not believe that, in seeking to bind the Railway Company to a bridge to be used in common with the city of Hoquiam, the Lumber Company had in view the limiting of its obligation respecting its co-operation in the securing of franchises in Hoquiam. Neither are we inclined to give serious credence to the reason, advanced by the president of the Lumber Company, that his company wanted to go on record as being in favor of the type of bridge which the city of Hoquiam was insisting upon, and that the Lumber Company did not want the city to think that it was opposed to the erection of a joint user bridge. The testimony tended to show that, had the current of traffic between East Hoquiam and West Hoquiam been deflected across the Hoquiam river by means

of the bridge proposed to be built by the Railway Company at Simpson avenue, the lands and business of the Lumber Company would have been materially benefited by reason of increase in value. This, as we view the testimony, was the real reason for the insertion of the bridge clause. That was no part of the original understanding between the parties, and must be deemed to have been an attempt on the part of the Lumber Company to introduce into the agreement a new and distinct subject-matter.

But the ultimate refusal of the Railway Company to execute the formal agreement was not caused by the insertion by the Lumber Company into the formal draft of the clause respecting a joint user bridge. It had served to delay the execution of the formal agreement, but negotiations between the parties were still in progress on the 9th day of September, 1910, on which date the clause respecting the bridge became immaterial and of no effect by reason of the settlement of the controversy between the Railway Company and the city of Hoquiam. On that date the Railway Company, so far as the record reveals, stood ready and willing to execute the formal agreement called for by the letter and acceptance of June 9, 1909. All matters of dispute had at that time been adjusted to the satisfaction of both parties. But the Lumber Company, again disregarding the letter and acceptance, and treating it as having no binding effect upon it, demanded from the Railway Company an additional sum in addition to the purchase price mentioned in the letter and acceptance. There is a conflict in the testimony as to whether this demand was for interest or as an additional sum for the land. C. H. Jones, the president of the Lumber Company, who represented that company and made the demand, whatever it was, testified that in September, 1910, he went to the office of Mr. Holman, the chief engineer, representing the Railway Company; that Holman told him that he had just finished with the Hoquiam city committee and the citizens' committee of the Commercial Club in regard to the bridge matter, and that they were each going to build a bridge. Jones says he told Holman that he was glad they had settled on something, but that he thought they were mistaken that they did not have a common user bridge. Holman went on to say: "We can now fix up with you." Jones says he told Holman he was glad of that; that they had not changed their price, or anything, but he thought they ought to have interest. Holman wanted to know how much interest and what it was on. Jones says he replied that he did not know, but he thought they should have interest on the amount. Holman replied that he could not do anything in regard to interest and would have to drop the matter. Jones testified further that:

"No official of our company called upon the railroad company to carry out the original contract at any time after this interview with Holman in September, 1910, until Mr. Emerson tendered the deeds in June or July, 1911, after we heard they had arranged to operate over the Northern Pacific tracks. Mr. Emerson, through Mr. Griffiths, of Seattle, went to the railroad company in June or July, 1911. It was after we had information of the arrangement with the Northern Pacific. It came in a roundabout way. We took no steps in the matter until the deeds were tendered by Mr. Griffiths, when we learned

of the arrangement with the Northern Pacific. No formal agreement was ever tendered after the signing of the agreement which I signed."

J. R. Holman, the engineer of the Railway Company, and its representative in these negotiations, testified with respect to this conversation with Jones that it occurred on September 9, 1910; that Mr. Bridges, the attorney for the Railway Company was present; that the conference was after the agreement with the city had been reduced to writing and signed; that Jones came over (to Seattle) on request by telephone. Holman relates the proceedings of the conference as follows:

"I remarked that we had now reached an agreement with the bridge committee with reference to the bridge. Mr. Jones said: 'Yes; so I understand.' I stated in a general way the terms of that agreement, and concluded by saying: 'We are now ready to close up our trade with you.' Mr. Jones said: 'Yes.' I said: 'This can be done now merely by your making a satisfactory deed, and we will make payment.' Mr. Jones said: 'Yes.' I said: 'We will make the payment, which I understand is $134,000, according to the tentative agreement.' Mr. Jones says: 'Yes; but now the property will cost you more money; it will cost you $144,000.' I says: 'What is the extra $10,000 for?' Mr. Jones says: 'Well, we considered this trade closed over a year ago, and there is a matter of interest.' Mr. Bridges broke into the conversation at that point and said to Mr. Jones: 'I don't see how you can take that stand. You have been in possession of the property all the time, and it has been understood and agreed between us that this matter was held up awaiting negotiations with the city.' Mr. Jones broke into Bridges' talk and said: 'That makes no difference. That property will now cost you $144,000.' I says: 'Mr. Jones, we will never consider that for a minute; we will not pay that price.' Mr. Jones said: 'You will either pay that price or not get the property.' I says: 'Well, we will not take the property at that price. I will not agree to it.' Mr. Jones remarked: 'Well, either you or somebody else will pay that price before you get the property.' He appeared during the latter part of the conversation very much irritated. He was flushed in the face, and went out of the office after saying these last words, or, rather, slammed the door after him as he went out."

That was the end of the conference.

J. R. Bridges, the attorney for the Railway Company, who was present at the conference referred to in the foregoing testimony, testified as follows:

"There were present Mr. Jones and Mr. Holman and myself. Mr. Holman stated to Mr. Jones that an agreement had been made with the citizens' committee with reference to the bridge at Simpson avenue crossing, whereby the railroad was to put a bridge on part of the street that would be in the nature of a lift bridge, and the city, whenever they chose to, should have the remainder of the street. Mr. Jones said that he understood that such was the condition. * * * Mr. Holman then stated to Mr. Jones that the railroad company was ready now, this bridge matter having been settled, to close the deal for the purchase of the right of way from the Northwestern Lumber Company, which, he said, he remembered the consideration was to be $134,000. Mr. Jones answered, and said: 'Yes; that was the amount; but,' he said, 'it will cost you more money now; it will cost you $10,000 more, or $144,000.' Mr. Holman said to Mr. Jones: 'I do not know why it should be any more than it was; why you should make it $144,000.' Mr. Jones answered by saying that this price had been put on about a year before, and that now the price was $144,000. At that stage of the conversation I said to Mr. Jones that it did not look reasonable or fair that he should increase the price of it, although the price of $134,000 had been fixed something like a year ago; that there had been many things standing in the way of consummation, and that his company had been in possession and occupancy of the land all the time,

221 F.—52

818 · 221 FEDERAL REPORTER

and the railroad company had had no use of it whatever. He said that that did not make any difference; that the price now was $144,000. It appeared that my talk to him rather put him out of humor, or at any rate he left that impression with me. He was somewhat flushed. Mr. Holman then said: 'Now, Mr. Jones, we are ready to take up this deed for $134,000, and pay you for it; but we will not pay you any more.' Mr. Jones says: 'You cannot have it for any less than $144,000,' and walked out of the office. That was the end of it.".

Mr. Bridges further testified:

"As far as my knowledge goes, there was no talk with the Northwestern people after September, 1910, concerning the right of way, until August 5, 1911, when Mr. Emerson and Mr. Griffiths, who was representing the Lumber Company as their attorney in that matter, came to my office and asked me if I was secretary or some official of the Grays Harbor & Puget Sound Railway Company, and I told them that I was secretary formerly, and they then made demand with reference to the taking over of this property and at that time tendered a deed. That was some three months after the announcement had been made of the arrangement with the Northern Pacific. They had and presented deeds executed by the Northwestern Lumber Company—two or three different deeds; one was a quitclaim deed, and one a warranty. It was a formal tender of performance on their part. They demanded $134,000. Mr. Griffiths, in the presence of Mr. Emerson, stated that they now made demand that the railroad company now take up the deed on payment of $134,000, and they waived any interest claim, and waived anything that might have been in the contract with reference to the bridge clause, and said they made their demand upon the purported contract which had been executed by the Northwestern Lumber Company, and which the railroad company refused to execute, and the original offer in the Emerson proposition and the acceptance thereof by Mr. Baldwin. I refused the tender. The suit was brought soon afterwards."

There was no provision in the letter and its acceptance of June 9, 1909, respecting payment of interest "pending transfers," or pending negotiations for the completion of the formal agreement. The demand of the Lumber Company for an additional sum of $10,000, or for any sum, as interest on the original purchase price for the period during which negotiations for the purchase of the property had been in progress, was therefore a demand for the performance by the Railway Company of a condition upon which the minds of the parties had not met, and was a condition not covered by or included in any of the writings exchanged between the parties. It was accordingly rejected.

But interest on the purchase price could not be legally demanded by the Lumber Company until the Railway Company was in default in payment, and it was not in default in September, 1910, when the demand was made, for the reason that the Lumber Company did not tender or offer to tender to the Railway Company its deeds to the property, notwithstanding the latter company offered then to pay the purchase price. At this point the negotiations between the parties failed. No agreement was reached as to the terms of the formal agreement, and no offer was made by the Lumber Company to carry out the terms of the original agreement, and no agreement was had as to further negotiations. The transaction was clearly at an end. Thereupon the Railway Company proceeded to negotiate with the Northern Pacific Railway Company for an entry into the city of Hoquiam over the tracks of the latter road, and for the use of its station facilities in Hoquiam, and this arrangement was finally completed in May, 1911.

In the meantime the Lumber Company did nothing. It did not seek to revive negotiations for the sale of its property until the agreement between the Railway Company and the Northern Pacific Railway Company had been made public. It then came forward in July or August, 1911, and tendered the Railway Company its deeds to the property and demanded payment of $134,000, without interest. This was nearly a year after the Lumber Company had refused to accept that sum for its property. It was then too late. The transaction had been closed and was at an end, and there was no equity in the situation requiring its revival.

There is but one conclusion to be drawn from these proceedings, and that is that no final agreement was reached with respect to the formal agreement provided in the letter and its acceptance of June 9, 1909, and no such agreement was reached or otherwise reduced to writing concerning the sale and conveyance of the property mentioned in that letter. There was therefore no contract to be enforced in this case, and the court was right in entering a decree dismissing the bill.

The decree of the District Court is affirmed.