## ELKHORN–HAZARD COAL CO. et al. v. KENTUCKY RIVER COAL CORPORATION.

Circuit Court of Appeals, Sixth Circuit.
June 6, 1927.

No. 4659.

1. Appeal and error ⬅1011(1)—Finding of District Judge on conflicting evidence and not against its preponderance will be accepted.

Finding of District Judge, resting on conflicting evidence and not decidedly against its preponderance, will be accepted on appeal.

2. Contracts ⬅22(3)—Rule that contract results when acceptance is mailed applies to offer by mail, or when it is inferable that offer contemplated such acceptance.

Rule that a contract results when an acceptance is placed in the mails, even though it is lost and not delivered, applies when offer is made by mail, or when parties live some distance apart, and it is fairly inferable that offer contemplated acceptance by mail.

3. Contracts ⬅22(3)—Mailing acceptance held not to constitute contract, where offer was delivered personally, with no agreement for reply thereto by mail.

Where writing alleged to constitute an offer was delivered personally, with nothing to indicate agreement that reply thereto might be mailed, mailing letter of acceptance *held* not to constitute a contract, since acceptance or approval had to be communicated to or received by other party, before it could be held there was a meeting of minds.

4. Contracts ⬅22(3)—Rule that contract results on mailing acceptance is applicable only if offer is intended of itself to create contractual relations.

In order that rule that contract results when acceptance is placed in the mails may be applicable, it is essential that offer must be one which is intended of itself to create contractual relations on its acceptance.

**5. Landlord and tenant ☞25(5)—Acceptance pursuant to letter indicating that preparation and execution of lease was necessary to contract did not result in contract.**

Where letter alleged to have constituted an offer indicated that preparation and execution of a lease was necessary to creation of contract, and treated of only few of terms which would ordinarily be embodied in such lease, mailing acceptance of offer did not result in contract.

**6. Contracts ☞32—Whether contract results in exchange of communications is question of intention.**

Whether a contract results from an exchange of definite communications, when a form of contract is intended later to be prepared and executed, is mainly a question of intention.

**7. Specific performance ☞87—Specific performance cannot be had after mailing acceptance to offer to lease, where there was violation of covenant against subleasing.**

Defendants in suit to enjoin them from removing coal from tract of land are not entitled to specific performance of contract alleged to have resulted from mailing acceptance of proposition to lease premises, where they were guilty of wrongful and intentional violation of covenant ordinarily contained in mining leases against subleasing without lessor's consent, as such conduct deprived them of any standing in a court of equity.

**8. Specific performance ☞87—Contract wrongfully and intentionally violated in anticipation cannot be specifically enforced.**

No one has a right in equity to enforce specifically a contract, which he has in anticipation wrongfully and intentionally violated.

**9. Trespass ☞44—Trespasser has duty to show conduct was inadvertent or unintentional.**

If trespass is wrongful, nothing else appearing, it will be presumed to be willful, and duty is on trespasser to explain his conduct, and show it was inadvertent or unintentional, or under bona fide belief of right.

**10. Trespass ☞67—Whether trespass was willful or inadvertent is question of fact.**

Whether a trespass was willful, or inadvertent, or unintentional, is a question of fact.

**11. Mines and minerals ☞52—Evidence held to support finding that trespass by removing coal was willful.**

In suit to enjoin removing coal from land owned by plaintiff and recover damages for coal removed, evidence *held* to support finding that trespass was willful.

**12. Mines and minerals ☞51(5)—Value of coal at pit mouth, without allowance of mining expense, is proper measure of damages for willful trespass.**

Value of coal at pit mouth is proper measure of damages in case of willful trespass, without credit for labor and expense of mining and bringing it to surface.

Appeal from the District Court of the United States for the Eastern District of Kentucky; Andrew M. J. Cochran, Judge.

Suit by the Kentucky River Coal Corporation against the Elkhorn-Hazard Coal Company and others. Decree for plaintiff, and defendants appeal. Affirmed.

T. E. Moore, Jr., and H. C. Faulkner, both of Hazard, Ky. (W. A. Stanfill, of Hazard, Ky., on the brief), for appellants.

Jesse Morgan, of Hazard, Ky. (P. T. Wheeler, of Hazard, Ky., and John D. Carroll, of Frankfort, Ky., on the brief), for appellee.

Before DENISON and MOORMAN, Circuit Judges, and WESTENHAVER, District Judge.

WESTENHAVER, District Judge. The appellee, Kentucky River Coal Corporation, brought this suit in equity to enjoin appellants from mining and removing coal from a tract of land owned by it, known as the Williams tract, situated in Letcher county, Ky., and to recover damages for the coal so removed. An injunction was granted as prayed, and damages assessed for the value of the coal at the mouth of the mine pit, as for a willful trespass. The defense was that appellants had a valid contract for a lease under which they had rightfully entered into possession, and, if liable otherwise than by the terms of that contract, could be held only for damages recoverable from an innocent trespasser. In their answer they also set up a counterclaim, praying specific performance of that contract, which was denied.

Upon due consideration of all matters urged, we are of opinion that the decree of the court below was right. We do not think appellants had a contract for a lease. If they had the contract now asserted, they had, by knowingly violating its terms prior to entry, barred themselves of all right to enforce it specifically; and inasmuch as they entered into possession, and removed the coal with full knowledge of the facts showing their want of right, they cannot escape the consequences following upon a willful and intentional trespass.

Admittedly appellants did not have a lease, nor any legal right to the possession. If a contract for a lease exists, it must be deduced from the facts now to be stated. The Elkhorn-Hazard Coal Company had developed coal mining properties adjoining the Williams tract. On April 9, 1924, that company gave an option to Gorman and Pursifull for a lease of its mining properties. On April 18,

Mr. Cockburn, general manager and superintendent of the Elkhorn Company, called on Mr. Dudley, president of the Kentucky River Coal Corporation, at his office in Lexington. As a result of this interview, a writing was handed him personally, reading as follows:

"Your Mr. Cockburn is in my office to-day, saying you want to lease some acreage belonging to this company, known as the Williams land on Solomon's branch in Letcher county, Ky., and lying behind some lands you have under lease, fronting on the waters of Sand Lick, containing 264 and a fraction acres. I have said to him that I would be willing to make a lease to your company of this land at a royalty of 10 cents per ton of 2,000 pounds, and a minimum say on what you might mine the first six months after signing this lease; the first year following, $1,000; and the second year following and each year thereafter $2,000, the Elkhorn-Hazard Coal Company paying all county, state, and school taxes on same. If this meets with your approval, Mr. W. O. Davis, our general counsel, on his return to this office, will draw up a lease for your signatures according to the above terms. Yours very truly, Kentucky River Coal Corporation, by W. S. Dudley, President."

At this interview it was represented by Cockburn that he was on his way to attend a meeting of the directors of his company in West Virginia, and that he wished to know upon what terms a lease could be had of the Williams land. The writing was given to him, so that he might lay the same before the board for their consideration. Nothing was said as to the manner in which Mr. Cockburn might transmit the decision of the board. Several days later, Dudley saw him in Lexington, but nothing was said upon the subject. Appellee next heard of the matter in the following December.

Cockburn, instead of doing what he said he intended to do, took the letter and showed it to Gorman and Pursifull, and delivered it to T. E. Moore, counsel of the Elkhorn Company at Hazard, Ky. On the 28th of April, Gorman and Pursifull accepted their option to lease the Elkhorn mining properties, attaching thereto a condition that the lease should embrace the Williams tract. Thereupon Mr. Moore prepared, with their knowledge, a form of acceptance of the April 18th proposal, incorporating it in a letter of instructions which was mailed to Mr. Bell, secretary of the Elkhorn Company, at Raphine, Va., who copied the acceptance and mailed it to T. W. Miller, president of the Elkhorn Company, at Elkhorn, W. Va., with instructions to approve it and forward it to appellee. This letter of acceptance bears date of May 5. On May 7, probably before it could have been received in due course of mail, Gorman and Pursifull executed the formal sublease with the Elkhorn Company.

[1-3] The letter of acceptance, omitting recitals, says: "It accepts offer as proposed in the letter aforesaid, and requests that your company draw up its customary lease as your company makes to other persons under similar circumstances." The mailing of this letter of acceptance is relied on as completing a contract for a lease. It is urged, with much support in the record, that this letter was not in fact mailed. The District Judge has found that it was mailed, and also that it was never received by appellee. As this finding rests on conflicting evidence, and is not decidedly against its preponderance, it will be accepted. Union Trust Co. v. White Motor Co. (6 C. C. A.) 21 F.(2d) ——. The rule is invoked that a contract results when an acceptance is placed in the mails, even though it is lost and not delivered; but we do not think this rule applicable to the present situation.

The rule applies when the offer is made by mail, or when the parties live some distance apart, and it is fairly inferable that the offer contemplated an acceptance by mail. If the proposal has been delivered personally, the rule, as stated in 6 R. C. L. 614, is as follows: "In such case the proposer is entitled to personal notice that his offer has been accepted, and in the absence of proof of any agreement on his part that such notice might be sent to him by mail, or that such notice so sent has been actually received by him within the time limited, there has been no notice of such acceptance, and unless the acceptance of the offer has been communicated to the person making it, it is of no avail." See Weaver v. Burr, 31 W. Va. 736, 8 S. E. 743, 3 L. R. A. 94, 103; Williston on Contracts, §§ 81, 83.

In this case, the writing asserted to be an offer was delivered personally. Nothing appears to indicate an agreement that the reply thereto might be sent by mail. The contrary is inferable from Mr. Cockburn's statement of his purposes and his later presence in Lexington. The acceptance or the approval had to be communicated to or received by the appellee before it could be held there was a meeting of the minds of the parties.

[4] Moreover, it is essential to the applicability of this rule, that the offer must be one which is intended of itself to create contractual relations upon its acceptance. See 6 R. C. L. § 23, p. 600. The letter is not in form an offer. It merely says that the writer "would be willing to make a lease." Its last

paragraph calls for a communication to the writer of an approval, and repels the idea that a contract would result by merely mailing an acceptance. It states that, after receipt of that approval, a lease would be drawn up and executed. It was clearly not intended to create contractual relations merely by mailing an acceptance.

[5, 6] Furthermore, we think the letter, in view of the circumstances, indicates that the preparation and execution of the lease were necessary to the creation of a contract. The letter treats of only a few of the terms which would ordinarily be embodied in a mining lease. It does not say that the mining lease would be such as appellee was accustomed to make to others in similar circumstances. This expression is found only in the undelivered letter of acceptance. Whether a contract results from an exchange of definite communications, when a formal contract is intended later to be prepared and executed, is a question which has received much consideration. Whether one so results is mainly a question of intention. The law is well stated in Mississippi & Dominion Steamship Co. v. Swift, 86 Me. 248, 29 A. 1063, 41 Am. St. Rep. 545, 553, as follows:

"If the party sought to be charged intended to close a contract prior to the formal signing of a written draft, or if he signified such an intention to the other party, he will be bound by the contract actually made, though the signing of the written draft be omitted. If, on the other hand, such party neither had nor signified such an intention to close the contract until it was fully expressed in a written instrument and attested by signatures, then he will not be bound until the signatures are affixed. The expression of the idea may be attempted in other words: If the written draft is viewed by the parties merely as a convenient memorial, or record of their previous contract, its absence does not affect the binding force of the contract; if, however, it is viewed as the consummation of the negotiation, there is no contract until the written draft is finally signed. In determining which view is entertained in any particular case several circumstances may be helpful, as whether the contract is of that class which are usually found to be in writing; whether it is of such nature as to need a formal writing for its full expression; whether it has few or many details; whether the amount involved is large or small; whether it is a common or unusual contract; whether the negotiations themselves indicate that a written draft is contemplated as a final conclusion of the negotiations. If a written draft is proposed, suggested or referred to, during the negotiations, it is some evidence that the parties intended it to be the final closing of the contract."

See to the same effect the authorities cited in the margin.[1]

Applying these tests, we are further of opinion that a written lease was contemplated as a final conclusion of the negotiations. The terms of the letter so indicate. As already said, it is not in form an offer to contract, but merely an expression of a willingness to make a lease. It calls for a previous expression of approval, without which no lease is to be prepared and executed. The subject-matter is of a nature to require a formal writing for its full expression. It is of that class which is usually put in writing. The letter treats of only a few of the terms of the usual lease. The amount involved is not small. The relations contemplated were to endure over a period of years.

Moreover, even if a contract to make a lease on the customary terms is established, appellants at the time they entered and took possession and began mining and removing coal, were not entitled to have specific performance. They insist that appellee had a standard form of lease. They offered evidence showing the customary terms of such a lease. Among those terms is a covenant that the lessee will not assign or sublet without the consent of the lessor. When Cockburn approached the appellee, one purpose in getting the lease was that it might be sublet to Gorman and Pursifull. It was well known to all appellants that appellee would not do business with Gorman and Pursifull and would not consent to a sublease to them. The intention to make this sublease was concealed from the appellee by all the appellants. Gorman and Pursifull exercised their option on condition that the Williams tract should be included. They did so at the time Mr. Moore prepared at Hazard the form of acceptance and forwarded it. They executed the formal lease before the letter of acceptance in due course could have been returned. According to Pursifull, the question of getting consent to the sublease was discussed on April 29. He says they were then advised by Mr. Moore, attor-

1 Jenkins v. Alpena (6 C. C. A.) 147 F. 641; General Motors Co. v. Abell (1 C. C. A.) 292 F. 922; Barber-Colman Co. v. Magnano (1 C. C. A.) 299 F. 401, 6 R. C. L. p. 600, § 23; Id. p. 618, § 39; Northwestern Lumber Co. v. Grays Harbor & P. S. Ry. Co. (9 C. C. A.) 221 F. 807; McCormick v. Oklahoma City (8 C. C. A.) 203 F. 921; Locomobile Co. v. Bergdoll (C. C.) 192 F. 447; Hackley v. Oakford (3 C. C. A.) 98 F. 781; Ambler v. Whipple, 20 Wall. 546, 556, 22 L. Ed. 403.

ney for the Elkhorn Company, that this was only a technical question, and that, as soon "as we pay the minimum royalty and mine the coal, in his judgment they would have to comply or furnish the lease." All the appellants went ahead with knowledge that the lease had not been executed, and that the consent to the sublease had not been obtained, evidently intending to postpone that issue until after coal had been mined and minimum royalties were to be paid.

[7, 8] Thus it appears that all the appellants were guilty of a wrongful and intentional violation of the covenant against subleasing without the lessor's consent. This conduct deprives them of any standing in a court of equity. They did not come into court with clean hands. It is no answer to say that the lessor ought to consent, or that he is not damaged so long as the sublessee pays royalties and observes the other covenants of the lease. If this were true, a covenant against subleasing is a nullity. No one has a right in equity to enforce specifically a contract which he has in anticipation wrongfully and intentionally violated.

This was the situation when in October Gorman and Pursifull, under their sublease from the Elkhorn Company of its mining property, including the Williams tract, entered on the last-named tract and removed the coal, as to which they have been charged as willful trespassers. They entered with full knowledge of all the facts above stated. Appellee had no knowledge of such entry, nor of their preparations to mine until after the 6th of December, when the president of the Elkhorn Company wrote: "We are now ready to have the lease executed." This letter was written evidently in pursuance of the plan outlined by Mr. Moore on April 29, when Gorman and Pursifull exercised their option. Appellee replied, denying ever having made any lease, and all knowledge of the doings of appellants, and at once brought this suit.

[9-11] The court below was right in holding the trespass was not innocent or inadvertent or unintentional. If the trespass is wrongful, nothing else appearing, it will be presumed to be willful. The duty is cast upon the trespasser to explain his conduct and to show it was inadvertent or unintentional or under a bona fide belief of right. See Resurrection Gold Mining Co. v. Fortune Gold Mining Co. (8 C. C. A.) 129 F. 668, 669; Liberty Bell Gold Mining Co. v. Smuggler-Union Mining Co. (8 C. C. A.) 203 F. 795, 802; Central Coal & Coke Co. v. Penny (8 C. C. A.) 173 F. 340, 344. No adequate explanation is offered. Whether the trespass was of one kind or the other is a question of fact, as to which the finding of the trial court should not be disturbed, unless it is against the clear preponderance of the evidence. In our opinion, the finding is in accordance with the evidence. Appellants, including Gorman and Pursifull, were not acting under any mistake of fact, which, if they believed to be true, might induce a good faith belief that they had a right to take possession and remove coal. No good faith effort was made to assure themselves that they had such a right. With full knowledge that the lease had not been made and that consent to sublease was not obtained, they contented themselves, so far as appears, with the casual response, already noted, of counsel for the Elkhorn Company. See Benson Mining Co. v. Alta Mining Co., 145 U. S. 434, 12 S. Ct. 877, 36 L. Ed. 762; Pine River Logging Co. v. United States, 186 U. S. 279, 292, 22 S. Ct. 920, 46 L. Ed. 1164; Raydure v. Lindley (6 C. C. A.) 268 F. 343; Pittsburgh & W. V. Gas Co. v. Pentress Gas Co., 84 W. Va. 449, 100 S. E. 296, 7 A. L. R. 901, 922, note.

[12] The court below adopted the right measure of damages. The value of the coal at the pit mouth was taken as that measure, without credit for the labor and expense of mining and bringing to the surface. The law to this effect is well settled. See Pine River Logging Co. v. United States, supra; Guffy v. Smith, 237 U. S. 101, 35 S. Ct. 526, 59 L. Ed. 856; 7 A. L. R. 922, note; North Jellico Coal Co. v. Helton, 187 Ky. 394, 219 S. W. 185.

The decree of the court below is affirmed, with costs.