NATIONAL BANK OF KENTUCKY et al. v.
LOUISVILLE TRUST CO.

No. 6435.

Circuit Court of Appeals, Sixth Circuit.
Oct. 13, 1933.

98

100

Robert S. Marx, of Cincinnati, Ohio (Nichols, Morrill, Wood, Marx & Ginter, of Cincinnati, Ohio, on the brief), for appellant.

Robert G. Gordon, of Louisville, Ky. (Squire R. Ogden and Gordon, Laurent & Ogden, all of Louisville, Ky., on the brief), for appellee.

Before HICKS, HICKENLOOPER, and SIMONS, Circuit Judges.

HICKENLOOPER, Circuit Judge (after stating the foregoing facts).

■ This is an action brought by the appellee for specific performance of an alleged parol contract for the sale to appellant of certain real estate in the city of Louisville, known as 421 West Market street, which contract was said to have been entered into on June 21, 1929. The defendant bank having subsequently become insolvent, and its affairs being in the process of final liquidation, it is conceded that an action in equity for specific performance, strictly speaking, will not lie against either the receiver or the bank. The contract, if one there was, being still wholly executory, we concur in the position just stated. The federal law provides for the method of liquidation of national banks, for the conversion of their assets into money, and for the ratable distribution of these funds among creditors. In addition to the right of a receiver to repudiate executory contracts (Cf. U. S. Trust Co. v. Wabash W. R. Co., 150 U. S. 287, 299, 14 S. Ct. 86, 37 L. Ed. 1085; Dayton Hydraulic Co. v. Felsenthall, 116 F. 961 [C. C. A. 6]), the granting to the complainant of relief in the nature of specific performance would be the equivalent of full satisfaction of its claim, and it would thus receive a preference to which it is not entitled. For this reason a bill for specific performance will not lie. Southern Express Co. v. Western North Carolina Railroad Co., 99 U. S. 191, 200, 25 L. Ed. 319.

■ But it is said that this is not, strictly speaking, a bill for specific performance, but rather one for recovery of the stipulated purchase price and the foreclosure of its vendor's lien. In this contention counsel for the complainant have become somewhat confused by the language of the courts in setting forth some of the necessary consequences of the right to specific performance in equity. This right is of very ancient origin. From the instant that a valid and enforceable contract for the sale of real estate has been entered into, equity has, from times immemorial, regarded the contracting purchaser as the equitable owner. Thereafter the risk of loss or damage to the premises, by fire, flood, or other hazard, is upon the vendee; for, in the event of such loss, the vendor may still have specific performance. There is also a resulting equitable conversion of the real estate in the hands of a vendor, that is, the legal title retained by the vendor and subject to his bond for title will descend as personalty, and will be so regarded generally, while the right of the vendee to compel performance by the vendor will, in the event of the death of the vendee, pass to his heirs at law and not to his next of kin. The vendee is therefore said to be the equitable owner.

■ But these are only incidents or necessary consequences of the right to specific performance, and in seeking to give a simple and easily understood reason for them, courts have frequently said that the vendor "holds the legal title to the real estate in trust for the vendee and as security for the payment of the agreed consideration," and that the vendee likewise holds the purchase money in trust for the vendor; but, obviously, there is no real trust. All that is meant is that the vendee, because of the nature of the bargain, or the unpaid vendor, because the right should be mutual, may compel specific performance. Before performance is thus compelled, it is manifest that the vendor holds the legal title subject to this equitable right of the vendee to compel a conveyance, and that there is also an as yet unexercised right in the vendor to compel the vendee to accept and pay for the property. Hence, until specific performance, the vendee is regarded as the equitable owner, and the risk of loss is upon him; and the vendor holds the legal title subject to the vendee's

equitable rights which are analogous to the rights of a cestui que trust only in that a conveyance may be compelled, and, possibly, in that the vendee is entitled to increment in value, rents, and profits, etc., if and when performance is had.

So also with the statement that a contracting vendor of real estate holds the legal title "as security for the payment of the purchase price." This means, and was intended to mean, no more than that, while the vendee has a right to compel specific performance, the vendor will not be required to convey unless and until the purchase price be paid. This suggests another insuperable difficulty in adopting complainant's contention here made. Unless there be a right in the complainant to recover a judgment for the entire purchase price of the property, there can be no foreclosure of a vendor's lien or sale of the security to satisfy such a claim. This right to recover the purchase price would exist at law only after complete performance of the contract on the part of the vendor. It exists in equity only by virtue of the right to specific performance. There must first be a decree that the vendee specifically perform its contract, that is, that it pay the purchase price, before there can be the subsequent relief of sale of the property, application of the proceeds of such sale in satisfaction of the obligation already decreed, and finally a decree disposing of the surplus receipts, or making provision for the payment of any deficiency. The fact that the complainant is willing to waive in part its right to a mandatory order for the payment of the deficiency, which right normally forms a part of the remedy obtainable in an action for specific performance, and to accept in lieu of such mandatory decree a similar mandate that the receiver of the National Bank of Kentucky receive, file, approve, report to the Comptroller, and pay dividends upon the claim of the Louisville Trust Company in the sum of $857,096.50 with interest at 6 per cent. per annum from October 14, 1930, until such dividends plus any sums which may be received from the sale of the property equal the face value of the claim plus interest, does not prevent the present action from being one for specific performance, or the relief granted from being essentially the specific performance of the contract. Except upon such hypothesis there could be no judgment for the entire alleged purchase price, but only for the amount in which the Louisville Trust Company had been damaged by the proved breach of a contract to purchase.

We have been cited to no case which fundamentally conflicts with the above views, and we know of none. Nor do we regard the fact that ejectment will not lie after delivery of possession of the real estate under a bond for title, and that the only remedy of the vendor in such a case is in a court of equity, as inconsistent with the position here taken. This is but to say that equity affords a remedy where the legal remedy of ejectment would be unavailable. Nor does our position deny to the complainant full equality of relief with all other creditors. The complainant still has possession and title to the building in question. In addition to this it is entitled to enforce at law whatever rights it has acquired by virtue of the alleged breach of contract by the National Bank of Kentucky. Upon any judgment so obtained it is entitled to whatever dividends are paid other creditors. It is not entitled to more than this equality of treatment simply because, were circumstances other than they are, a right to specific performance might exist.

Since the decree of the court below must be reversed and the cause be remanded for further proceedings, and since such proceedings may involve a transfer of the case to the law side of the court, a repleading of the cause, and a trial of the issues of the existence and alleged breach of the contract, it seems necessary that we express our views at this time on several issues here presented and elaborately argued, which it is insisted should bar a right of recovery either at law or in equity.

The first of these questions is presented by the claim of the appellant, defendant below, that the evidence fails to establish the making of any contract. There was ample parol evidence of an authorized offer of sale which was acceptable to and accepted, in words of vague generality, by the board of directors of the National Bank of Kentucky. On the other hand, there are many facts and circumstances tending to show that neither party intended the making of a contract, with all the finality thereby implied. Among these facts and circumstances we note the exceeding informality of the recorded action by the board of directors of the National Bank of Kentucky. Among the members of the board were prominent attorneys of the city of Louisville and men of broad business affairs. It might reasonably be assumed that in a transaction involving so much, had it been intended to act within the sphere of the creation of legal liability, there would have been the presentation

of a formal resolution, a direct authorization of the officers to carry into effect the will of the board, and a record of the vote taken in the adoption of the resolution. The secretary of the board testified that there was simply a general discussion in which a number of the directors took part and that the minutes were merely the statement of his impression of the general consensus of opinion, which was in accord with proceeding, when the time was ripe, along the lines suggested.

▌ There are also the further facts that in November, 1929, five months after the alleged contract was supposed to have been made, the president of the Louisville Trust Company wrote to the president of the National Bank of Kentucky, asking him to try to interest a prospective purchaser in the Louisville Trust Building at Fifth and Market streets; that in the event of the sale of that building the Louisville Trust Company apparently intended to remain in the premises at 421 West Market street; that the Louisville Trust Company continued to use the new building for a period of some seven months, without making the alterations in its old building which would be necessary if the trust company were again to occupy it; that at the end of this time a joint committee was appointed to consider the advisability of both banks occupying "the new Louisville Trust Building," thus referring to it as still the sole property of the Louisville Trust Company; that during this period, also, numerous steps were taken looking to the denationalization of the National Bank of Kentucky and the complete consolidation of the two banks; and that the supposed contract contains no provision either for the time and manner of payment of this large sum of money, or the time of taking effect of the agreement of sale and the payment of interest by the National Bank of Kentucky or rental by the Louisville Trust Company. The contentions that the entire purchase price would become due, that interest would start upon tender of possession and title to the property, and that the time of making such tender rested entirely with the trust company, are based only upon implication. The supposed agreement is also silent as to the effect, upon the title to be conveyed, of certain leases to portions of the property and a certain restrictive covenant with adjoining owners. This, too, is left to inference. If there was in fact any essential part of the contract upon which the minds of the parties had not met, or upon which there was not an agreement, even though the negotiations evidenced a complete willingness, or even an announced determination, to agree in the future upon such issues as might subsequently arise, it must still follow that a valid and binding contract was not made as of the earlier date. Compare La Compania Bilbaina De Navegacion De Bilbao v. Spanish-American, etc., Co., 146 U. S. 483, 497, 13 S. Ct. 143, 36 L. Ed. 1054. Compare, also, Horvath v. McCord Radiator & Mfg. Co., 35 F.(2d) 640 (C. C. A. 6).

▌ And so, also, if neither party had intended the making of a contract by what was done. It was long ago established that, notwithstanding the parties may have gone through the form of executing a formal written contract, yet if it also had been agreed, be it only by parol, that such contract was not to take effect until the happening of some other event, and such subsequent event did not happen, the written contract will not be enforced even though it had been delivered to the obligee at the time of execution. Ware v. Allen, 128 U. S. 590, 9 S. Ct. 174, 32 L. Ed. 563. It has also been decided that if both parties intended to have a written instrument signed by them as evidence of any contract they might make, and neither considered the contract concluded until the written instrument was fully executed, no contract would come into existence in respect to that subject-matter until the writing in question was signed. Ambler v. Whipple, 20 Wall. 546, 556, 22 L. Ed. 403. See, also, Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corp., 20 F.(2d) 67 (C. C. A. 6); Murrell v. American Railway Express Co., 207 Ky. 322, 269 S. W. 293. So it would seem to us that if the action taken by the board of directors of the National Bank of Kentucky on June 21, 1929, was in truth only an expression of the general consensus of opinion, or was in the nature of preliminary negotiation in which a general willingness to sell and to buy was expressed by the parties (Cf. Cumberland & O. V. R. Co. v. Shelbyville, B. & O. R. Co., 117 Ky. 95, 107, 77 S. W. 690), but without intent or understanding by either that this expression was in itself to operate as the making of a contract, no contract should be held to result, for such was the intent of the parties; and this is so whether the objective theory or the subjective theory of mutual assent be adopted. Restatement, Contracts, § 71 (a); Elkhorn-Hazard Coal Co. v. Kentucky River Coal Corp., supra. No one has ever supposed that the actor who, as part of his lines in a play, went through the form of

making a contract by parol, incurred any contractual obligation thereby. The form is there but intent is lacking.

The aspect of the matter just discussed gains some weight, also, from the fact that the boards of the two companies were practically identical as to personnel. One may naturally ask one's self the question whether under such circumstances a contract would be deemed necessary, or whether it would not, rather, be considered an idle formality. In this respect the present case is not unlike that of Head v. Providence Insurance Co., 2 Cranch, 127, 166, 2 L. Ed. 229, where it is said: "The communications stated in the record, lead to an event which might have been so readily completed, that it might have been, and probably was, supposed unnecessary to pass through the previous solemnities of a contract binding themselves to do that which, if really the wish of both parties, might so speedily be accomplished." Thus, here, it is obvious that with unified control there was no real necessity for previous formality. And so, should there be a conflict of evidence upon these matters in the event of a retrial at law, the question of the existence or nonexistence of a valid and binding contract should be submitted to and determined by the jury under proper instructions. What we have said is merely for the purpose of showing that upon the present record decision is not foreclosed one way or the other; and, under the circumstances of the case, such decision is not for us now to make.

It is next claimed by the appellant that even if the making of a contract on June 21, 1929, be conceded as established by the evidence, such contract is voidable under the doctrine of such cases as Geddes v. Anaconda Copper Mining Co., 254 U. S. 590, 41 S. Ct. 209, 65 L. Ed. 425, unless it likewise appear from the evidence that the transaction was entirely fair and in the interest of the National Bank of Kentucky; and that such could not here be the case for the reason that the National Bank of Kentucky then held between four and eight million dollars of substandard assets, and no contract which contemplated so large and so "frozen" an investment could be regarded as in the interest of a purchaser circumstanced as was the appellant. Upon this issue we think it necessary only to say that, upon the present record, the unfairness to the purchaser which would be so evident under date of January 13, 1930, does not seem apparent as under date of June 21, 1929. As of the earlier date, no compelling reason occurs to us why the National Bank of Kentucky might not have purchased a building of its own or why a contract to acquire a very recently completed building at slightly less than the actual cost of construction was in any way unreasonable. It is true that there were some slow and past-due obligations, but it does not appear in evidence that the capital was at all impaired, that the situation differed materially from that which confronted other banks of comparable size, or that there was any real reason for serious apprehension as to solvency. Extreme business sagacity might have warned against such action, but on this record we have no doubt of the good faith of the directors, taken as of June 21, 1929.

Appellants also contend that the voluntary appointment of a receiver of the property of the Louisville Trust Company, and its conceded insolvency prior to reorganization, amounted to a breach by that company of any contract which might have existed for the sale of its realty, citing Central Trust Co. v. Chicago Auditorium Ass'n, 240 U. S. 581, 36 S. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580, and other cases of like purport. These cases but recognize the now established doctrine that where a party bound by an executory contract repudiates his obligations or disables himself from performing them before the time for performance, the promisee has the option to treat the contract as ended, so far as further performance is concerned, and maintain an action at once for the damages occasioned by the anticipatory breach; but this doctrine has no application to the present case. The benefit of the contract, if any, and if beneficial, would pass to the receiver of the trust company, who was in no sense incapacitated from performing. In fact, after his appointment, the receiver of the Louisville Trust Company demanded performance of the alleged contract by the National Bank of Kentucky, and filed a claim with the receiver of that bank based upon the alleged breach. This was in effect an adoption of the contract, if one existed, and a tender of performance. Nor was there any inconsistency between performance by the Louisville Trust Company, through its receiver, and the obligation of that receiver to reduce to money as rapidly as possible the assets of the company of which he was a receiver. Even though no breach had occurred on the part of the National Bank of Kentucky prior to the appointment of the receivers for the two banks, which is still an open question, we agree with the decision of the court below that this defense is without merit.

Finally, it is claimed that even though a

parol contract of sale had been entered into on June 21, 1929, such contract is not enforceable because of noncompliance with the statute of frauds of Kentucky.[1] It must be noted in this connection that no claim is made that the parol contract was made later than June 21, 1929. Doubtless, it was not, and could not be, claimed that the contract was made at the joint meeting of the boards of the two banks on January 13, 1930, so closely following the collapse of New York Stock Exchange prices, the general decline in real estate values, and the obvious necessity for keeping all banking institutions in a liquid condition, for, as already indicated, it probably could not be affirmatively established that, as of such date, the terms of the contract were entirely fair, and the making of the contract beneficial to the National Bank of Kentucky, as well as to the Louisville Trust Company, as is required by the doctrine of Geddes v. Anaconda Copper Mining Co., supra.

The precise question now for consideration, therefore, is this: Conceding that a parol contract was made on June 21, 1929, for the sale of the premises in question, do the minutes of the meeting of the board of the Louisville Trust Company on January 13, 1930, the minutes of the meeting of the board of the National Bank of Kentucky on June 21, 1929, and the letters signed by various officers of the trust company and addressed to the National Bank of Kentucky or its officers, considered together, constitute a sufficient note or memorandum of the sale to comply with the provisions of the Kentucky statute of frauds, and was there need for delivery of these writings to the vendee, and acceptance of them by the vendee, as and for such note or memorandum. In other words, when a note or memorandum of the sale of real estate, under the Kentucky statute, is signed only by the vendor, but is not drawn up or signed until some seven months after the alleged parol agreement, may the vendee be held upon such parol agreement without his signature to the writing or without some act on his part, such as the delivery to and acceptance by him of the note or memorandum evidencing the sale, which act shows his continued assent to the terms therein expressed? This question must, we think, be answered in the negative, under the construction given to the statute by the Court of Appeals of Kentucky, leaving open for fact determination the further question whether the necessary delivery and acceptance took place.

In practically all jurisdictions it is held that the statute of frauds does not operate to invalidate the parol contract (unless the language used specifically so provides), but only bars the bringing of an action to enforce such contract if the requirements of the statute have not been obeyed. Likewise, in a large majority of the states of the United States, it is held that "the party to be charged" means the party against whom it is sought to enforce the parol contract—the defendant in the action brought for that purpose. The first of these doctrines the Court of Appeals of Kentucky has adopted; the second it has rejected, holding that the vendor of real property is the "party to be charged," and that the note or memorandum called for by the Kentucky Statute of Frauds need be signed only by him. City of Murray v. Crawford, 138 Ky. 25, 127 S. W. 494, 28 L. R. A. (N. S.) 680.

But these doctrines, although adopted by the court from the earliest times, were always qualified, in the very cases adopting them as well as collaterally, by the seemingly inconsistent doctrine that the validity of the contract depended upon the mutuality of the right to enforce its obligations (this is inconsistent with the first doctrine stated in the preceding paragraph); and that until the memorandum be signed by both the vendor and the vendee, or, being signed only by the vendor, until it be delivered to and accepted by the vendee, neither the vendor nor the vendee should be regarded as bound by the parol agreement. These cases in effect construe the statute as requiring either that both the vendor and vendee sign the note or memorandum of sale, or, if it be signed only by the vendor, that it be delivered to and accepted by the vendee. In other words, there must be, it is said, mutuality in the execution of the memorandum itself. To this effect, see McDowel v. Delap, 2 A. K. Marsh. (Ky.) 33; Thomas' Ex'x v. Trustees of Harrodsburg, 3 A. K. Marsh. (Ky.) 298, 13 Am. Dec. 165; Murray v. Pate, 6 Dana (Ky.) 335; Curnutt v. Roberts, 11 B. Mon. (Ky.) 42; Usher's Ex'r v. Flood, 83 Ky. 552; Newburger v. Adams, 92 Ky. 26, 17 S. W. 162; Cumberland & O. V. R. Co. v. Shelbyville, B. & O. R. Co., 117 Ky. 95, 107, 77 S. W. 690; City of Murray v. Crawford, supra; Duteil v. Mullens, 192 Ky. 616, 234 S. W. 192, 20 A. L. R. 361; Gorman v. Gorman, 210 Ky. 65, 275 S. W. 366, 367; Cox v. Stamper, 221 Ky. 745, 299 S. W. 723; Nugent v. Humpich,

---

[1] "No action shall be brought to charge any person * * * upon any contract for the sale of real estate * * * unless the * * * contract * * * or some memorandum or note thereof, be in writing, and signed by the party to be charged therewith, or by his authorized agent; but the consideration need not be expressed in the writing. * * *" Kentucky Statutes, § 470.

231 Ky. 122, 21 S.W.(2d) 153; Klatch v. Simpson, 237 Ky. 84, 34 S.W.(2d) 951; and compare Vogt v. Newmark Co., 244 Ky. 91, 100, 50 S.W.(2d) 54.

In Murray v. Pate, supra, the court says: "To say that the purchaser is bound to accept the deed, which will bind him to pay the money, would be to hold him bound by the contract at the will of the vendor, who is not bound, and would enable the vendor to maintain an action against the vendee, for the non-acceptance of the deed, and for the non-payment of the money; while the vendee could not, by paying or tendering the money, have an action against the vendor. This would be unreasonable, and is expressly negatived by the case of McDowel v. Delap." Later, in Currnutt v. Roberts, supra, the court again suggests that to permit this would in effect place it within the vendor's power, "at his election, to make every verbal contract for the sale of land binding upon the parties, although no such right exists in the vendee. This would destroy all mutuality between the parties to such contracts, be unreasonable, and violate the well settled principle that contracts to be valid, must be obligatory upon both the parties."

In Gorman v. Gorman et al., supra, the court stated the question under consideration to be whether the signature of the appellee (vendor and plaintiff below) to a letter accompanying a deed which was submitted for approval, supplied the lack of any written contract, or note, or memorandum, signed by the vendor and delivered to and accepted by the vendee. The court said: "It is possible that the answer to this question might be in the affirmative in jurisdictions where the courts hold that the required memorandum need not possess the quality of mutuality, and is sufficient to comply with their statutes if it is only signed by one party and with papers therein referred to identifies the subject-matter and essential terms of the contract. But whether this is true or not we need not consider, since this court uniformly has construed our statute to mean that, while the written memorandum of the contract need be signed by the vendor only, it must be delivered to and accepted by the vendee before the contract becomes enforceable by either party. Duteil v. Mullens, 192 Ky. 616, 234 S. W. 192, 20 A. L. R. 361. This means, of course, that in this state the memorandum must acquire the element of mutuality before it can animate the proscribed verbal contract, and this necessarily involves the intention and purposes of the parties as expressed in the delivered and accepted instrument."

An effort is made upon the part of the appellee to distinguish these cases upon the ground that the statements, that delivery to and acceptance by the vendee is necessary where a memorandum is signed only by the vendor, were dicta in that the so-called memorandum was, in most of the cases, merely a letter or signed deed which in no way referred to a previous parol contract; and that the memorandum was therefore insufficient upon this ground. But in almost all of the cases the court does not itself place its decision upon this supposed deficiency in the note or memorandum, and we are impressed with the fact that from very early times, at least in actions brought by the vendor against the vendee, some act of acceptance of the writing has been required before the vendee may be held. This seems to us the more reasonable criterion to apply, under the decided cases, in determining compliance with the statutory requirements. In Kentucky such act of acceptance plays the part that signature does in most other jurisdictions. It shows assent on the part of the defendant to the action.

Of course, there is no necessity that the making of a note or memorandum in writing should be contemporaneous with the making of the parol agreement. This may be subsequently done, but in such case there should be a continuance of the defendant's acquiescence and some act upon its part evidencing such continued assent. Should the case be retried upon the law side of the court below, therefore, we think that one of the issues of fact to be decided in the case will be whether, if the making of an otherwise valid parol agreement be shown, there was such delivery to and acceptance of the memoranda by the vendee as evidenced an intent upon the part of both the contracting parties to validate or make enforceable the original agreement by reducing its terms to written form. A new contract as of January 13, 1930, might not be valid, but we see no reason why the parties could not, if such was their wish, make a parol contract of June 21, 1929, valid and enforceable by mutually agreeing to that reduction to writing which would satisfy the statute of frauds. Whether this was done would be a question of fact upon which we do not think we need express an opinion.

If the memorandum was otherwise sufficient and as such was delivered to and accepted by the vendee, we are of the opinion that the contract might well be construed as a sale

for cash of such title as was acquired by the Louisville Trust Company through its purchase of the Louisville National Bank & Trust Company, and that the memorandum would not be held insufficient alone for failure to expressly state these facts; provided, always, that a parol contract to this effect was found to have been made, which contract was not invalidated by the failure of the parties to agree upon any other essential provision.

The decree of the District Court is reversed, and the cause is remanded for further proceedings consistent herewith.