**NEBO CONSTRUCTION COMPANY, Inc.**

v.

**SOUTHEASTERN ELECTRIC CON-STRUCTION COMPANY, Inc., et al.**

**Civ. A. No. 7238.**

United States District Court
W. D. Louisiana,
Shreveport Division.

Dec. 21, 1961.

Horace M. Holder, Tucker, Bronson & Martin, Shreveport, La., for plaintiff.

Reuben M. Word, Carrollton, Ga., Val Irion, Lunn, Irion, Switzer, Trichel & Johnson, Shreveport, La., Gambrell, Harlan, Russell, Moye & Richardson, Atlanta, Ga., John R. Pleasant, Booth, Lockard, Jack, Pleasant & LeSage, Shreveport, La., for defendants.

BEN C. DAWKINS, Jr., Chief Judge.

Grasping hopefully at shadows, for want of any real substance, plaintiff here seeks to create a binding contract out of a mere hope that such might have been consummated.

Nebo Construction Company, Inc., a Louisiana corporation with its principal office in Shreveport, Louisiana, originally brought this action against (1) Southeastern Electric Construction Company, Inc., an Alabama corporation qualified to do business in Louisiana, (2) Southeastern Constructors, Inc., a Florida corporation qualified to do business in Louisiana, (3) Houston Gas and Oil Corporation, a Florida corporation qualified to do business in Louisiana (4) Roy Richards, a citizen of Georgia who does not have an agent for service of process in Louisiana, and (5) Richards & Associates, Inc., a Kentucky corporation, not qualified to do business in Louisiana, with its principal office in Carrollton, Georgia. Service of process was made on the Secretary of State as agent for Richards & Associates, Inc., pursuant to LSA–R.S. 13:3471(5)(d). Roy Richards, individually, appeared through counsel and was served pursuant to LSA–R.S. 13:3471. The action has been dismissed voluntarily as against Houston Oil and Gas Corporation.

Generally, plaintiff's theory of attempted recovery is this: Nebo Construction Co., Inc., was incorporated in January of 1958, with H. B. McCullough as president and J. B. McCullough as vice president. Prior to incorporation, the McCulloughs had operated under the trade name of "H. B. McCullough & Sons," and were

* Credit is due William G. Somerville, Jr., Law Clerk to the Court, for the preparation of this opinion.

engaged in the business of clearing rights-of-way for pipelines and similar projects. Since 1950, the McCulloughs have participated in various jobs with companies either owned or controlled by Roy Richards, president of Richards & Associates, Inc. In 1955, the Southeast Alabama Gas District Company let a contract to Richards and Southeastern Construction Co. and the McCulloughs subcontracted with Richards for the project. Richards did not require a performance bond from the McCulloughs on this project and Richards has waived bond on other jobs subsequent to 1955.

In early 1958, a firm known as Midwestern-Walco opened negotiations for the clearing of right-of-way for a pipeline project running from Louisiana to Florida. Plaintiff contends that Richards, through Frank Rose, his agent, entered into an agreement with the McCulloughs to the effect that, if the contract for the right-of-way work was secured by Richards, the latter would jointly venture with or subcontract the work to the McCulloughs' company and would post the required performance bond in favor of Midwestern-Walco. Plaintiff further contends that Richards promised to give plaintiff any financial help that might be required for completion of the job. According to plaintiff, Richards, however, brought Southeastern Construction Co. and Southeastern Constructors, Inc., into the negotiations with the understanding that Stewart Culpepper, an officer in the Southeastern companies, was to act as Richards' agent in securing the contract from Midwestern-Walco. Richards controlled both Southeastern companies. It was understood, so plaintiff argues, that any participation by either one or both of the Southeastern companies would be in the interest of Richards and that such participation would not affect the one-half share of the profits going to the McCulloughs.

The contract finally was let to the two Southeastern companies and the McCulloughs allegedly were advised that this was merely a formality necessitated by "union problems." Plaintiff contends that Culpepper, the officer of the Southeastern companies, was heavily indebted to Richards as a result of failures on earlier projects and that Richards posted the performance bond for the Southeastern companies on the Midwestern-Walco job.

Richards later wrote a letter to plaintiff repudiating the McCulloughs' understanding and denying that he had ever agreed to let them participate in the project or post the required performance bond. Plaintiff alleges that the reason the contract was let in the name of the Southeastern companies was for the purpose of circumventing the purported arrangements with Nebo. It is argued that the Southeastern companies are merely acting as "dummies" or "alter egos" for Richards, that Richards is the actual beneficiary of the contract, and that this arrangement will allow Culpepper, an officer of the Southeastern companies, to pay off his indebtedness to Richards.

Plaintiff alleges that Richards has been put in default and should be held liable to Nebo for one half of the profits for the breach of their "joint venture" agreement. It prays for judgment against all other defendants *in solido* for one half of the profits derived from the project.

The record in this case is replete with vagueness, indefiniteness and lack of certainty as to the terms, details, and provisions of the so-called "agreement" or "contract" between Richards & Associates and Nebo. The following findings of fact are but a few reasons why plaintiff's case must fall of its own weight, or rather, lack of weight.

According to the testimony of J. B. McCullough, Frank Rose, Roy Richards' agent, made two telephone calls to Shreveport prior to a meeting held on March 18th, 1958, in Baton Rouge. It is alleged that in both of those calls Rose asked for bids from Nebo on the pipeline project and that J. B. McCullough was led to believe that Nebo "would be taken care of" by Richards & Associates. It is undisputed that many essential details were not agreed upon and it is clear that all that happened was that both parties con-

templated future negotiations leading up to a possible contract.

In response to questions relative to the two calls made by Rose to him, J. B. McCullough testified as follows:

"The Court: Up until the time you went to Baton Rouge, as I understood your testimony a moment ago, there was no definite contract between you and Richards & Associates and Mr. Rose? It was simply an understanding you would work out something?

"The Witness: That is correct. The final details would have to be worked out on our first trip."

Rose testified that he failed to remember the details of either telephone conversation with McCullough; that he may have talked with either J. B. or H. B. McCullough; and that the purpose of the calls was simply to ask that representatives of Nebo meet with Stewart Culpepper and other possible sub-contractors in Baton Rouge for the purpose of inspecting the right-of-way. Rose denied that he assured J. B. McCullough that Nebo "would be taken care of" after submission of bids on the project; to the contrary, he testified that he conformed to the practice of treating all prospective sub-contractors as possible future parties to an agreement and that no conditional agreements were entered into at that stage of negotiations.

Clearly, from the depositions and testimony of the parties to this alleged contract, neither party considered itself bound contractually prior to the March 18th meeting in Baton Rouge. In fact, none of the prospective sub-contractors had sufficient information to form the basis for calculating the bids or cost estimates. The agreement, if any, was simply that Nebo would be included in the project negotiations scheduled at Baton Rouge and that the McCulloughs would be given an opportunity to inspect the location of the right-of-way.

J. B. and H. B. McCullough proceeded to Baton Rouge for the March 18th meeting with Stewart Culpepper. They all flew over the right-of-way in an airplane supplied by Richards & Associates and the McCulloughs noted the lay of the land and the topographical elements which would determine the cost factors and the amount of their future bid price.

Testifying as to what occurred between the McCulloughs, Frank Rose, and Stewart Culpepper immediately following the trip during which Section One of the proposed project area was viewed, J. B. McCullough said:

"The Court: Did you give him [Culpepper] some figures then?

"The Witness: No, sir. He asked me what we thought the line would be worth and I told him we had not determined a figure, and at this time I wanted to be sure and check with Mr. Rose as to Mr. Culpepper's part in the project, you know—what part he was going to have, if any.

"I mentioned at that time when he called me that he said Mr. Culpepper was there strictly in a capacity to assist us and that he didn't have any definite part in the project. I asked him at that time, would it be satisfactory with him to work it on a joint venture where there would be bonding and financing. I think what they referred to yesterday as sponsoring a job, where they actually put up the bond. If we could get subcontractors to do the job, we would supervise it and draw half the profits.

"He said, 'Well, I will have to check with Roy [Richards] on it.' I said, 'It will be all right.' He said, 'You work it out and we will take care of you, and I want to speak to Roy.'

"The Court: Still there wasn't a definite agreement. You made a proposition and he said he would have to check with Roy?

"The Witness: That's right.

"The Court: He did not accede to it?

"The Witness: No, sir.

"The Court: You went on from there and ran the rest of the line to Mobile?

"By Mr. Holder:

"Q. Excuse me. Did I understand you had completed your telephone conversation with Rose at that time? When you were relating that, did you mention to him the question of your supervising it if you couldn't sub it? A. Yes, sir, if we couldn't be subcontractors, that was understood.

"Q. I wasn't sure you related that, or made that point clear. A. We knew we had this agreement up to that time. Mr. Rose knew we couldn't bond it or finance it. There would be no other point of us giving him figures without the understanding we could work out parts of the agreement we were working on up to the present time, that they would be financing it and bonding it.

"The Court: In other words, as I understand it, your conversation from Lucedale, among other things, included a proposition you put to Mr. Rose whereby it would be operated as a joint venture?

"The Witness: That's right.

"The Court: And that you would split the profits?

"The Witness: Yes, sir.

"The Court: He definitely did not say 'yes' or 'no' at that time?

"The Witness: That's right.

"The Court: Was that the end of the discussion at that time?

"The Witness: Yes, sir."

After the Lucedale telephone call, J. B. McCullough went to a motel where, at some time after midnight, he arrived at a figure for a bid on the project. He later took Stewart Culpepper to the bus station. On the return trip to Shreveport, J. B. and H. B. McCullough stopped at a public telephone on the side of the highway, somewhere east of Natchez, where J. B. McCullough telephoned Frank Rose in Carrollton, Georgia. In response to the Court's questioning as to the substance of this second telephone call from Mississippi, J. B. McCullough testified:

"The Court: What was that conversation?

"The Witness: I asked Mr. Rose if he had a chance to talk to Roy and he said he did, and Roy said it was okay. I asked Rose if he had to talk to Mr. Culpepper. He said they hadn't gotten the project and if they were successful in getting it, we would be well taken care of. The main thing was to get the job, and we would work out the rest of it.

"By Mr. Holder:

"Q. When you say 'work out the rest of it,' what do you mean by that? A. There was a point I brought up as to salary for supervising the project. The expenses and minor details of the project we didn't go into. We were talking about the profit and joint venturing the profit, but we didn't go into the detail as to whether we would do all this supervising and it come out of our end of it or whether we could get paid for it.

"Q. You have explained it when you said, 'some other details.' A. Yes, sir. After we got the job, there would have to be other details worked out on it."

Continuing, J. B. McCullough testified that Rose told him that Richards had approved the "agreement" between them, including the joint venture arrangement; that Rose was given a detailed breakdown of the figures arrived at by the McCulloughs, averaging 30 cents per foot, including fence gaps, burning of timber that would be cut, but not grubbing of the right-of-way for which the McCulloughs wanted five cents more per foot; and that Frank Rose agreed to help in finding sub-contractors to perform the work. J. B. McCullough stated that the detailed breakdown of figures for Section One would be partially applicable to other sections, but no agreement was reached as to which contractors would do the work of those sections.

Further in J. B. McCullough's testimony, we find:

"Q. I believe you have testified that this contract that you have filed suit on was made at the time when you were in a telephone booth in Mississippi talking with Mr. Frank Rose, who was in Carrollton, Georgia; is that correct? A. No, sir. I believe I said our first agreement was made from Shreveport to Mr. Rose.

"The Court: But you admitted to me yesterday that was just a tentative proposition. There wasn't any firm agreement.

"The Witness: We knew we had an agreement *of some sort,* Judge. [Emphasis added.]

"The Court: But you didn't know what it was?

"The Witness: No, sir. The final portions of it was worked out in Mississippi.

"The Court: What did you talk about first during that telephone call when you were speaking from Mississippi after you had left Mobile on the first trip you made over this project?

"The Witness: We discussed the proposition that I had talked to him from Lucedale about wondering if he talked with Mr. Roy Richards.

"By Mr. Hill:

"Q. In the second call you asked him whether he talked with Mr. Roy Richards; is that correct? A. In calls, that would have been actually—

"Q. Excuse me. In the second call, during the course of this first trip across section 1? A. Yes, sir. That would have been the second call.

"Q. You asked Mr. Rose whether he had been in touch with Mr. Roy Richards? A. Yes, sir.

"Q. You had been advised in the first call he would have to get in touch with Mr. Roy Richards, and that's why you were asking him if he talked to Mr. Richards? A. Mr. Rose said he would have to talk to Roy about it.

"Q. The call you made east of Natchez in Mississippi, you asked Mr. Rose whether he talked to Mr. Richards; is that correct? A. That is correct.

"Q. What did Mr. Rose say? A. To the best of my knowledge, he said he talked to Mr. Richards and indicated it was all right; that we could work it out as we had previously talked about it."

On cross examination, J. B. McCullough testified about the trip he and H. B. McCullough made to Carrollton, Georgia, to talk with Roy Richards about the alleged agreement:

"By Mr. Hill:

"Q. Mr. McCullough, did I understand your testimony in just the last few minutes to be that on the last trip to Carrollton a part of your purpose in making that trip was to get this contract finalized? A. I don't believe I said 'finalized.' I think I said 'get it in writing and work out the details.'

"Q. Some of the details had not been worked out even on this last trip to Carrollton; is that correct?

A. That is correct."

From admissions in the depositions and testimony of J. B. and H. B. McCullough, it is clearly established that the following "details," among others, were not "worked out" or agreed upon among the parties: (1) who would supply the expensive equipment for clearing the right-of-way, for example, bulldozers, draglines, trucks, chain saws, etc., (2) the number of sections, if any, upon which Nebo would work, (3) who would furnish the 100% performance and lien bonds required by Richards & Associates and Midwestern-Walco on this project, (4) whether or not Nebo would supervise sub-contractors for a salary plus 50% of the profits, (6) who would pay for travel and other expenses, (7) who would assume the expense of overhead, bookkeeping, and rental of equipment for the project, and (8) by what means and on what terms the very heavy payroll expense, necessarily in-

volved in work of this kind, would be financed.

The failure of the parties to agree on these important material "details" is reluctantly acknowledged throughout the record by either J. B. or H. B. McCullough, the parties here seeking to enforce the purported contract on behalf of Nebo. Moreover, the parties to the alleged contract acknowledge that they contemplated a written agreement setting forth all details and requirements for the project. As J. B. McCullough put it, they wanted to "get it in writing and work out the details." This was never done. Roy Richards testified that he always required a formal, written contract with his subcontractors, and this is not disputed.

It is elemental that a Court cannot enforce a contract unless it can determine what it is. Negotiations for a contract may entail mutual expressions of agreement and yet the parties may fail to consummate a contract for the reason that they are not complete, some essential term or terms not having been concluded. The above-listed elements which were not agreed upon between Nebo and Richards & Associates form very important parts of the substance of a "would-be" contract such as this between the parties. Without a definite understanding on those points, neither party would know whether his individual efforts would prove profitable; indeed, some concessions probably would be made on either side as matters progressed during the bargaining stage in order that the parties might know the exact extent of their respective obligations and participation in the project. At best, the only agreement reflected in plaintiff's evidence was that Nebo "would be taken care of" by Richards, and we do not believe even that actually was agreed upon.

It is beyond the realm of reason that the McCulloughs would have believed Nebo to be bound irrevocably to Richards & Associates to perform the clearing work on Section One of the Midwestern-Walco project: to repeat, neither party knew who would furnish the necessary heavy equipment, or who would pay for it if rented; the amount of salary to be paid to the McCulloughs was not even discussed; no understanding was ever reached as to how the 100% bond would be obtained; no method for financing payroll expense had been agreed upon; and myriad details involving considerable money were left open to future negotiations. *So scant was this alleged agreement that in order to enforce it this Court would be required to write in for them more important provisions and details than the parties themselves even bargained over, much less agreed upon.*

As noted, there is also convincing evidence that the parties here did not intend to bind themselves prior to execution of a formal, written contract setting forth the necessary detailed provisions which would have been agreed upon at a later date. The greater the size and complexity of a transaction, the more likely it is that preliminary negotiations were intended to be tentative only. Here, we are convinced that the parties merely considered themselves to be bargaining in an atmosphere of changing relationships, the ultimate contract, to be arrived at and reduced to writing at some later date, if final agreement ever was reached.

The sheer indefiniteness of this purported contract renders it unenforceable. See Boatright v. Steinite Radio Corp., 46 F.2d 385 (10 Cir., 1931); Wynne v. McCarthy, 97 F.2d 964 (10 Cir., 1938); National Bank of Kentucky v. Louisville Trust Co., 67 F.2d 97 (6 Cir., 1933), and authorities cited therein. See, generally, Corbin on Contracts, Sec. 29.

No definite contract having been agreed upon between Nebo and Richards & Associates or Roy Richards individually, it follows that the letting of the Midwestern-Walco contract in the name of the Southeastern companies, whether for the ultimate benefit of Roy Richards or not, did not deprive plaintiff of anything to which it legally was entitled. Likewise, since there is not even a pretense of a contract between Nebo and the Southeastern companies, plaintiff is not entitled to recover from them under any theory.

For the reasons given, judgment will be rendered rejecting the demands of plaintiff, at its cost, against all defendants.

A proper decree should be presented on notice.