**Bruce BERGSTROM, et al., Appellees,**

v.

**SAMBO'S RESTAURANTS,
INC., Appellant.**

**No. 81–1973.**

United States Court of Appeals,
Eighth Circuit.

Submitted Feb. 11, 1982.

Decided Sept. 9, 1982.

Plunkett, Schmitt & Plunkett, Hugh V. Plunkett, III, Austin, Minn., for appellees.

O'Connor & Hannan, Steven J. Timmer, Faegre & Benson, Lawrence C. Brown, John F. Beukema, Steven C. Schroer, Minneapolis, Minn., for appellant Sambo's Restaurants, Inc.

Before HEANEY, ARNOLD and JOHN R. GIBSON,* Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Sambo's Restaurants, Inc., appeals from a final judgment obtained by Bruce and Ruth Bergstrom in the amount of $190,000. A jury found that Sambo's had contracted to convey a lease interest in its restaurant in Austin, Minnesota to the Bergstroms and that the contract was evidenced by a memorandum that complied with the Minnesota statute of frauds. Sambo's contends that any contract between the Bergstroms and Sambo's was barred by the statute of frauds, and that the district court[1] erred in instructing the jury. We affirm.

The Bergstroms had operated a restaurant in Austin, Minnesota for some years and because their lease was expiring desired to obtain another location. Coincidently Sambo's had been considering closing its Austin restaurant for some time because of economic conditions in the area and particular problems encountered in the restaurant's operation. Bergstrom contacted Sambo's corporate headquarters in Santa Barbara, California and shortly thereafter Leonard Scamardo, the eastern Regional Director of Sambo's wholly-owned real estate subsidiary, Restaurant Properties, Inc., contacted the Bergstroms. Scamardo was authorized to negotiate on behalf of Sambo's but the district court found and instructed the jury that he did not have authority from Sambo's to enter into contracts on its behalf.

Scamardo, following several conversations with the Bergstroms, sent them a letter proposal on September 14, 1979 enclosing the master lease on Sambo's Austin property from Kraus-Anderson, Inc., to Sambo's, and an assignment of the lease by Sambo's to Restaurant Properties, Inc. He also enclosed a proposed draft of a sublease agreement which he termed an assignment. The letter outlined the terms, including a rental of $1,700 per month for a five-year term, November 1, 1979 to 1984, with three options to extend for five years at increasing rentals.[2] The Bergstroms consulted with their attorneys and sent a revised agreement to Scamardo. Scamardo reviewed the negotiations with James Lohnas, Sambo's Director of Property Management, to whom he had sent copies of all the correspondence and proposed agreements. Lohnas and Scamardo both testified that Scamardo was authorized to negotiate with the Bergstroms on the basis of a percentage rental of 6% with a minimum rent of no less than $1,400 and a commencement date of November 1, 1979. Lohnas instructed Scamardo, "Don't lose this deal."

---

* United States District Judge for the Western District of Missouri at the time this case was submitted, sitting by designation.

1. Honorable Harry H. MacLaughlin, District Judge for the District of Minnesota.

2. There were other terms of the contract which were not the subject of further negotiation.

On September 26, 1979 Scamardo called the Bergstroms and they agreed to the changes authorized by Lohnas. Scamardo prepared a revised agreement by lining through and interlineating the earlier version. He then wrote a confirming letter to the Bergstroms on September 27, 1979, and enclosed the revised agreement so that the Bergstroms could initial the changes, sign it and return it to him. This the Bergstroms did. When Scamardo received the signed agreement, he forwarded it to Lohnas along with a management recommendation form setting out the essential terms of the sublease agreement.

When Lohnas received the papers from Scamardo, he in turn prepared a management recommendation form outlining the terms of the lease and forwarded it to his superior, Walter Leach, Assistant Treasurer of Sambo's, on October 3, 1979. He recommended the sublease of the Austin facilities to Bergstrom on the same terms and conditions that Scamardo had negotiated and which were set forth in the revised agreement which the Bergstroms signed and returned to Scamardo and which in turn was forwarded to Lohnas.[3]

The management recommendation form was signed by Leach and also by the President of Sambo's, Karl Willig, and both dated their signatures November 14, 1979. There was also a blank for the signature of Russell S. Young, Treasurer of Sambo's, but Mr. Young did not sign the memorandum.[4]

Lohnas directed a memorandum on November 5, 1979 to John Grant, of Sambo's Legal Department, attaching a copy of the management recommendation and stating, "I realize that this copy is not executed, however, it has been approved and I will forward a signed copy upon my receipt."

He informed Grant that it was imperative that the sublease document be drawn within the next three days or the deal might not close.

There was conflicting testimony about occurrences from this point.[5] Scamardo testified that in the first part of November, 1979 Lohnas called him and told him that the sublease had been approved by senior management and asked Scamardo to inform the Bergstroms. Scamardo did so, and told the Bergstroms that Sambo's would send a team to Austin to close the Sambo's restaurant in anticipation of the sublease. Bergstrom had talked with Lohnas earlier in November and Lohnas had told him that the sublease was approved. Shortly after November 15, Bergstrom had a second conversation with Lohnas and was told that Sambo's had been sold and the management changed but that this would not affect the sublease agreement. Lohnas denies these conversations with Scamardo and the Bergstroms.

Following the sale of Sambo's, the new management refused to go forward with the transaction and the Bergstroms filed suit shortly thereafter.

I.

■ Sambo's claims that the district court erred in failing to hold as a matter of law that any contract between the Bergstroms and Sambo's is barred by the Minnesota statute of frauds. The sole ground urged is that the written memorandum evidencing the contract was not delivered to the Bergstroms, and this fact is undisputed. The district court submitted the statute of frauds issue to the jury[6] and, after the verdict was returned, ruled as a matter of

---

3. This agreement was destroyed by Lohnas and was not introduced into evidence. Scamardo and the Bergstroms testified as to the contents of the document. Lohnas recalls seeing the document but does not recall whether he saw the signatures on it.

4. There was a conflict in testimony as to whether two or three signatures were required

for approval of the management recommendation.

5. We need not be concerned with the conflicts in testimony as this was for the jury to resolve.

6. The jury instruction contained the text of the applicable Minnesota statute of frauds provision, § 513.05, and the requirements of a mem-

law that there had been compliance with the statute of frauds. After judgment was entered, defendant moved for judgment notwithstanding the verdict on the ground that there was not sufficient evidence to permit the jury to find that the contract complied with the statute of frauds. The district judge denied this motion.[7]

The Minnesota statute of frauds, Minn. Stat. § 513.05, provides as follows:

> Every contract for the leasing for a longer period than one year ... of any lands ... shall be void unless the contract, or some note or memorandum thereof, expressing the consideration, is in writing and subscribed by the party by whom the lease or sale is to be made....

As is apparent, this statute differs from many in that it does not require the signature of "the party to be charged" but only that of the party by whom the lease is to be made. Beyond the language of the statute the Minnesota courts have created additional requirements, particularly with respect to the obligations of a vendee or lessee.

A recent decision of the Minnesota Supreme Court dealing with the statute of frauds is *Schwinn v. Griffith*, 303 N.W.2d 258 (Minn.1981). Schwinn, as conservator of an estate, authorized an auctioneer to conduct a sale. Following the successful purchase at the sale by Griffith, the auctioneer prepared a memorandum on behalf of both the buyer and seller. *Schwinn* held that the auctioneer accepted delivery of the memorandum on behalf of the purchaser, Griffith. In rejecting Schwinn's argument

that the statute would be satisfied by a vendor's signature alone, the court stated, "The better approach is for us to follow the cases that require the vendee to accept delivery of the writing." *Id.* at 262. The court further explained the undesirability of allowing only the vendor's signature to create an enforceable agreement and to bind an unwitting vendee with the following passage from 2 *Corbin on Contracts* § 397 (1950):

> [T]he courts have tried to prevent this result by requiring some sort of "mutuality." They have held that a memorandum signed by himself does not enable the vendor to enforce the contract unless the memorandum so signed has been delivered to the purchaser *or otherwise accepted by him* as a correct memorandum of agreement. (Emphasis added.)

As support for this passage from *Corbin*, *Schwinn* cites *National Bank of Kentucky v. Louisville Trust Co.*, 67 F.2d 97 (6th Cir. 1933), *cert. denied* 291 U.S. 665, 54 S.Ct. 440, 78 L.Ed. 1056 (1934), and 4 *Williston on Contracts* § 586 (1961). Sambo's argues that *Louisville* requires delivery of the memorandum to the lessee. *Louisville* holds that there was a memorandum delivered to and accepted by the vendee, but further explains the acceptance and delivery requirement as follows:

> [W]e are impressed with the fact that from very early times, at least in actions brought by the vendor against the vendee, some act of acceptance of the

orandum satisfying the statute. Sambo's only complaint about the instruction is its failure to include the element of delivery but no error in the instruction is asserted in this appeal.

**7.** In reviewing the propriety of a court's ruling on a motion for judgment n.o.v., we view the evidence in the light most favorable to the party which secured the jury verdict. *Sterling v. Commercial Union Insurance Co.*, 674 F.2d 697 (8th Cir. 1982); *Singer Company v. E. I. du Pont de Nemours & Co.*, 579 F.2d 433 (8th Cir. 1978).

The ruling of the district judge finding that the statute of frauds had been complied with as a matter of law and denying the motion for judgment notwithstanding the verdict on this

ground simply stated the conclusion without indication of the facts upon which the finding was based or the legal reasoning supporting the conclusion. The district judge was not technically required by the Federal Rules of Civil Procedure to make such findings. Had the reasons been specifically delineated, however, review of the issues on appeal would have been facilitated. *See: Morelock v. NCR Corp.*, 586 F.2d 1096, 1099, n.5 (6th Cir. 1978), *cert. denied* 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979). It is clear that the legal issue for determination by the court was simply whether delivery was required or showing of acceptance was sufficient, and whether there was sufficient evidence to demonstrate acceptance.

writing has been required before the vendee may be held.

67 F.2d at 105.

4 *Williston on Contracts* § 586 states, "[I]t would generally, if not universally, be necessary that the purchaser should have indicated his assent to the writing either *by accepting it or otherwise."* (Emphasis added.)

At least the language in *Gregory Co. v. Shapiro*, 125 Minn. 81, 145 N.W. 791, 793 (1914), demonstrates, in the earlier cases, the significance of the acceptance by the vendee.

Other Minnesota cases dealing with the statute of frauds recognize that the memorandum evidencing the contract may consist of letters if they are internally connected by references, express or otherwise, so as to show on their face that they related to the same subject matter. *Doyle v. Wohlrabe*, 243 Minn. 107, 66 N.W.2d 757 (1954). *Doyle* further states that the basic purpose of the statute of frauds "is only to provide reasonable safeguards to insure honest dealing" and that "it was not enacted to make a fetish of literal statutory compliance or a fetish of requiring a perfect written contract." 66 N.W.2d at 761.

The Supreme Court of Minnesota has held that the "technical requirements [of the statute of frauds] are only aids to discern where the truth lies in a given case, and we will not blindly apply those technicalities if they lead to a conclusion repugnant to commonsense." *Radke v. Brenon*, 271 Minn. 35, 134 N.W.2d 887, 891 (1965).

Sambo's argues that *Comer v. Baldwin*, 16 Minn. 172 (1870), a case decided before *Gregory*, compels the conclusion that delivery of the contract to the vendee is essential to comply with the statute of frauds. In *Comer* a deed and other papers were delivered to Comer by Baldwin but neither of the parties understood that this was a delivery of the deed that would pass title to the property. Plaintiff argued that the delivery of the deed was sufficient as a contract in writing and that he was entitled to specific performance. *Comer* found that there had been no complete delivery of the deed, and while it states that delivery of the contract was required by the statute of frauds, it concludes that if the instrument was delivered at all, it was as a conveyance and not otherwise. *Comer* cannot support the proposition that delivery of the memorandum in this case is an absolute requirement.

Sambo's also relies on *Bey v. Keeping*, 192 Minn. 283, 256 N.W. 140 (1934). *Bey*, however, essentially involves a failure of the parties to agree on the terms of the transaction. Its holding that when the proposal was made by the vendee there must be an acceptance in writing does no more than recognize the plain language of the statute that the vendor or lessor must sign the agreement.

■ This court gives great weight to the conclusions of the local district judge on questions of state law. *Associated Photographers, Inc. v. Aetna Casualty & Surety Co.*, 677 F.2d 1251, 1257 (8th Cir. 1982); *Lamb v. Amalgamated Labor Life Ins. Co.*, 602 F.2d 155, 160 (8th Cir. 1979).

■ We conclude that the district court did not err in its rulings based on the proposition that delivery of the memorandum was not an absolute requirement. While *Schwinn* and other cases contain language that the vendee must accept delivery of the memorandum, *Schwinn* also cites considerable authority that the memorandum may be "otherwise accepted" by the vendee. *Corbin, Williston* and the *Louisville* case all support this statement. With the common sense approach of the later cases, the emphasis on mutuality, and the desire not to make a "fetish of literal statutory compliance," the district judge could correctly find under Minnesota law that acceptance by the vendee will satisfy the statute and that delivery of the memorandum is not an absolute requirement.

■ The evidence in this case was that the Bergstroms had initialed Scamardo's corrections on the assignment of lease memorandum and had signed it and returned it to Scamardo, who in turn for-

warded it to Lohnas. The management recommendation prepared by Lohnas that was signed by the President and Assistant Treasurer of Sambo's contains the same terms as the assignment of lease agreement signed by the Bergstroms. Bergstrom, after being told of Sambo's approval, made several calls to Sambo's to inquire about the status of the transaction. Lohnas's secretary confirmed these calls.[8]

With this undisputed evidence of the Bergstrom acceptance, we find no error in the district court's rulings on the statute of frauds issue and in its denial of Sambo's motion for judgment notwithstanding the verdict. The judgment, which granted "enforcement against [a] wrongful repudiator," should not be set aside. *Radke v. Brenon*, 134 N.W.2d at 890.

## II.

Sambo's claims that the instruction on the formation of the contract should have informed the jury that it was necessary that Sambo's assent be communicated to the Bergstroms in order for a contract to be formed.[9]

■■ Sambo's essentially argues that any assent to the contract was internal and not communicated to the Bergstroms. There is no doubt that the formation of a contract requires a bargain in which there is manifestation of mutual assent, *Restatement (Second) Contracts § 17* (1981), and that expressions of mutual assent must be objective, not subjective. *Cederstrand v. Lutheran Brotherhood*, 263 Minn. 520, 532, 117 N.W.2d 213, 221 (1962).

The language of the instruction makes clear that the mutual assent "may be *expressed* in writing, orally, in acts, or partly in one of these ways and partly in others," and that "the language used and conduct of the parties must be such as to *disclose* sufficiently the fact that the minds of the parties have met . . . or *disclose* the fact that there has been a mutual assent." (Emphasis added.) The instruction also makes plain that the jury was to consider "what the plaintiff was told by Leonard Scamardo and James Lohnas."

■ We conclude that the instruction properly explained to the jury the necessity of an expression or disclosure of mutual assent, and has the meaning that the assent must be communicated. "Express," "disclose" and "communicate" all have a common dictionary definition of "to make known." If there was any question in the meaning of the language, the specific reference in the instruction as to what plaintiff was told by Scamardo and Lohnas makes clear that communication was adequately and sufficiently covered in the instruction. As this court has said, the language of the instruction is for the trial judge to determine. *Emery v. Northern Pacific R.R. Co.*, 407 F.2d 109, 113 (8th Cir. 1969). From our examination of the entire charge, we conclude that the jury was fairly and adequately instructed. The essence of Sambo's argument is simply to insist upon its own word "communicate" in place of the words "express" and "disclose." However, a party

---

8. The calls demonstrate continuing acquiescence by Bergstrom and evidence such continuing assent. See *Louisville, supra*, 67 F.2d at 105.

9. The court's instruction on the formation of the contract was as follows:

> For a contract to be created, it is necessary that there be a meeting of the minds of the parties upon the essential terms and conditions of the subject about which they are agreeing; that is, they must be in accord upon the essential terms and conditions. There must be a mutual assent. That mutual assent may be expressed in writing, orally, in acts, or partly in one of these ways and partly in others.

> The language used and the conduct of the parties must be such as to disclose sufficiently the fact that the minds of the parties have met, or have been in accord, on the terms of the agreement, or, in other words, disclose the fact that there has been a mutual assent.

> In the formation of a contract words alone are not the only medium of expression. You may consider all of the surrounding facts and circumstances in the context of the entire transaction, including the purpose, subject matter, the nature of the transaction, as well as what the plaintiff was told by Leonard Scamardo and James Lohnas.

has no "vested interest" in any particular jury instruction language. *Emery*, 407 F.2d at 113. The district court did not err in refusing Sambo's requested instruction containing the word "communicate."

### III.

Sambo's also claims that the jury should have been instructed that no "mutual assent" to the contract could be found if it was Sambo's intent not to be bound until an integrated document was executed by both parties.[10]

As evidence to support its requested instruction on "integration," Sambo's points out that the copies of the lease agreements sent to the Bergstroms were only "proposed drafts," and notes that James Lohnas testified that Sambo's policy was to have its leases prepared by its own Legal Department. This evidence may establish that Sambo's had an intention to assent only to an "integrated" contract, but does not establish that Sambo's expressed this intent to the Bergstroms or that the parties so agreed.

In its reply brief, Sambo's also relies on Scamardo's statement in his September 14th letter to the Bergstroms that "any comments you or your attorneys have on the documents should be presented to me as soon as possible so that a final lease can be acknowledged and executed by the parties." This language does not evidence, as Sambo's contends, an expression of its intent that there be no agreement between the parties until their integrated contract was prepared, but only that a final lease document would be prepared for execution by the parties.

Sambo's also points to the master lease between Kraus-Anderson, Inc. and Sambo's, and specifically to the clause providing that there should be no "obligation created" un-

til the lease document itself is fully completed and signed by both the lessor and lessee. This language certainly evidences an intent on the part of Sambo's that there not be a completed contract until executed by both parties, but the language in question dealt with the lease between Kraus-Anderson and Sambo's, and not with the proposed sublease between Sambo's and the Bergstroms. Had Sambo's desired to insert this language in its proposal to the Bergstroms, it would have supported Sambo's argument in this case, but Sambo's did not choose to do so. There is no evidence to support such an "integration" instruction, and the district court did not err in refusing Sambo's proposed instruction. *Kelley-Rickman, Inc. v. Hartford Life Ins. Co.*, 557 F.2d 639, 643 (8th Cir. 1977); *Weiby v. Wente*, 264 N.W.2d 624, 629 (Minn.1978).

We have carefully reviewed appellant Sambo's claims of error. We conclude that the district court did not err and that the judgment in favor of the Bergstroms should be affirmed.

---

10. The integration requirement, if made known to all the parties, would constitute a condition precedent to the formation of a contract under Minnesota law. *See, e.g.*, the recent case of *Bouten v. Richard Miller Homes, Inc.*, 321 N.W.2d 895 (S.Ct.Minn.1982), in which the

Minnesota Supreme Court held that the absence of a vendor's written assent prevented the formation of a contract in a case where the parties had specified that the agreement would be binding only upon the written acceptance of the vendor.